(Slip Opinion)    OCTOBER TERM, 2007    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BAZE ET AL. *v.* REES, COMMISSIONER, KENTUCKY DEPARTMENT OF CORRECTIONS, ET AL.

CERTIORARI TO THE SUPREME COURT OF KENTUCKY

No. 07–5439.   Argued January 7, 2008—Decided April 16, 2008

Lethal injection is used for capital punishment by the Federal Government and 36 States, at least 30 of which (including Kentucky) use the same combination of three drugs: The first, sodium thiopental, induces unconsciousness when given in the specified amounts and thereby ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs, pancuronium bromide and potassium chloride. Among other things, Kentucky's lethal injection protocol reserves to qualified personnel having at least one year's professional experience the responsibility for inserting the intravenous (IV) catheters into the prisoner, leaving it to others to mix the drugs and load them into syringes; specifies that the warden and deputy warden will remain in the execution chamber to observe the prisoner and watch for any IV problems while the execution team administers the drugs from another room; and mandates that if, as determined by the warden and deputy, the prisoner is not unconscious within 60 seconds after the sodium thiopental's delivery, a new dose will be given at a secondary injection site before the second and third drugs are administered.

Petitioners, convicted murderers sentenced to death in Kentucky state court, filed suit asserting that the Commonwealth's lethal injection protocol violates the Eighth Amendment's ban on "cruel and unusual punishments." The state trial court held extensive hearings and entered detailed factfindings and conclusions of law, ruling that there was minimal risk of various of petitioners' claims of improper administration of the protocol, and upholding it as constitutional. The Kentucky Supreme Court affirmed, holding that the protocol does not violate the Eighth Amendment because it does not create a substantial risk of wanton and unnecessary infliction of pain, torture,

or lingering death.

*Held:* The judgment is affirmed.

217 S. W. 3d 207, affirmed.

CHIEF JUSTICE ROBERTS, joined by JUSTICE KENNEDY and JUSTICE ALITO, concluded that Kentucky's lethal injection protocol satisfies the Eighth Amendment. Pp. 8–24.

1. To constitute cruel and unusual punishment, an execution method must present a "substantial" or "objectively intolerable" risk of serious harm. A State's refusal to adopt proffered alternative procedures may violate the Eighth Amendment only where the alternative procedure is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain. Pp. 8–14.

(a) This Court has upheld capital punishment as constitutional. See *Gregg* v. *Georgia*, 428 U. S. 153, 177. Because some risk of pain is inherent in even the most humane execution method, if only from the prospect of error in following the required procedure, the Constitution does not demand the avoidance of all risk of pain. Petitioners contend that the Eighth Amendment prohibits procedures that create an "unnecessary risk" of pain, while Kentucky urges the Court to approve the " 'substantial risk' " test used below. Pp. 8–9.

(b) This Court has held that the Eighth Amendment forbids "punishments of torture, . . . and all others in the same line of unnecessary cruelty," *Wilkerson* v. *Utah*, 99 U. S. 130, 136, such as disemboweling, beheading, quartering, dissecting, and burning alive, all of which share the deliberate infliction of pain for the sake of pain, *id.,* at 135. Observing also that "[p]unishments are cruel when they involve torture or a lingering death[,] . . . something inhuman and barbarous [and] . . . more than the mere extinguishment of life," the Court has emphasized that an electrocution statute it was upholding "was passed in the effort to devise a more humane method of reaching the result." *In re Kemmler*, 136 U. S. 436, 447. Pp. 9–10.

(c) Although conceding that an execution under Kentucky's procedures would be humane and constitutional if performed properly, petitioners claim that there is a significant risk that the procedures will *not* be properly followed—particularly, that the sodium thiopental will not be properly administered to achieve its intended effect—resulting in severe pain when the other chemicals are administered. Subjecting individuals to a substantial risk of future harm can be cruel and unusual punishment if the conditions presenting the risk are "sure or very likely to cause serious illness and needless suffering" and give rise to "sufficiently imminent dangers." *Helling* v. *McKinney*, 509 U. S. 25, 33, 34–35. To prevail, such a claim must present a "substantial risk of serious harm," an "objectively intolerable risk of harm." *Farmer* v. *Brennan*, 511 U. S. 825, 842, 846, and

Syllabus

n. 9. For example, the Court has held that an isolated mishap alone does not violate the Eighth Amendment, *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459, 463–464, because such an event, while regrettable, does not suggest cruelty or a "substantial risk of serious harm." Pp. 10–12.

(d) Petitioners' primary contention is that the risks they have identified can be eliminated by adopting certain alternative procedures. Because allowing a condemned prisoner to challenge a State's execution method merely by showing a slightly or marginally safer alternative finds no support in this Court's cases, would embroil the courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing execution procedures, petitioners' proposed "unnecessary risk" standard is rejected in favor of *Farmer*'s "substantial risk of serious harm" test. To effectively address such a substantial risk, a proffered alternative procedure must be feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain. A State's refusal to adopt such an alternative in the face of these documented advantages, without a legitimate penological justification for its current execution method, can be viewed as "cruel and unusual." Pp. 12–14.

2. Petitioners have not carried their burden of showing that the risk of pain from maladministration of a concededly humane lethal injection protocol, and the failure to adopt untried and untested alternatives, constitute cruel and unusual punishment. Pp. 14–23.

(a) It is uncontested that failing a proper dose of sodium thiopental to render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and of pain from potassium chloride. It is, however, difficult to regard a practice as "objectively intolerable" when it is in fact widely tolerated. Probative but not conclusive in this regard is the consensus among the Federal Government and the States that have adopted lethal injection and the specific three-drug combination Kentucky uses. Pp. 14–15.

(b) In light of the safeguards Kentucky's protocol puts in place, the risks of administering an inadequate sodium thiopental dose identified by petitioners are not so substantial or imminent as to amount to an Eighth Amendment violation. The charge that Kentucky employs untrained personnel unqualified to calculate and mix an adequate dose was answered by the state trial court's finding, substantiated by expert testimony, that there would be minimal risk of improper mixing if the manufacturers' thiopental package insert instructions were followed. Likewise, the IV line problems alleged by petitioners do not establish a sufficiently substantial risk because IV

team members must have at least one year of relevant professional experience, and the presence of the warden and deputy warden in the execution chamber allows them to watch for IV problems. If an insufficient dose is initially administered through the primary IV site, an additional dose can be given through the secondary site before the last two drugs are injected. Pp. 15–17.

(c) Nor does Kentucky's failure to adopt petitioners' proposed alternatives demonstrate that the state execution procedure is cruel and unusual. Kentucky's continued use of the three-drug protocol cannot be viewed as posing an "objectively intolerable risk" when no other State has adopted the one-drug method and petitioners have proffered no study showing that it is an equally effective manner of imposing a death sentence. Petitioners contend that Kentucky should omit pancuronium bromide because it serves no therapeutic purpose while suppressing muscle movements that could reveal an inadequate administration of sodium thiopental. The state trial court specifically found that pancuronium bromide serves two purposes: (1) preventing involuntary convulsions or seizures during unconsciousness, thereby preserving the procedure's dignity, and (2) hastening death. Petitioners assert that their barbiturate-only protocol is used routinely by veterinarians for putting animals to sleep and that 23 States bar veterinarians from using a neuromuscular paralytic agent like pancuronium bromide. These arguments overlook the States' legitimate interest in providing for a quick, certain death, and in any event, veterinary practice for animals is not an appropriate guide for humane practices for humans. Petitioners charge that Kentucky's protocol lacks a systematic mechanism, such as a Bispectral Index monitor, blood pressure cuff, or electrocardiogram, for monitoring the prisoner's "anesthetic depth." But expert testimony shows both that a proper thiopental dose obviates the concern that a prisoner will not be sufficiently sedated, and that each of the proposed alternatives presents its own concerns. Pp. 17–23.

JUSTICE STEVENS concluded that instead of ending the controversy, this case will generate debate not only about the constitutionality of the three-drug protocol, and specifically about the justification for the use of pancuronium bromide, but also about the justification for the death penalty itself. States wishing to decrease the risk that future litigation will delay executions or invalidate their protocol would do well to reconsider their continued use of pancuronium bromide. Moreover, although experience demonstrates that imposing that penalty constitutes the pointless and needless extinction of life with only negligible social or public returns, this conclusion does not justify a refusal to respect this Court's precedents upholding the death penalty and establishing a framework for evaluating the constitutional-

ity of particular execution methods, under which petitioners' evidence fails to prove that Kentucky's protocol violates the Eighth Amendment. Pp. 1–18.

JUSTICE THOMAS, joined by JUSTICE SCALIA, concluded that the plurality's formulation of the governing standard finds no support in the original understanding of the Cruel and Unusual Punishments Clause or in this Court's previous method-of-execution cases; casts constitutional doubt on long-accepted methods of execution; and injects the Court into matters it has no institutional capacity to resolve. The historical practices leading to the Clause's inclusion in the Bill of Rights, the views of early commentators on the Constitution, and this Court's cases, see, *e.g., Wilkerson* v. *Utah*, 99 U. S. 130, 135–136, all demonstrate that an execution method violates the Eighth Amendment only if it is deliberately designed to inflict pain. Judged under that standard, this is an easy case: Because it is undisputed that Kentucky adopted its lethal injection protocol in an effort to make capital punishment more humane, not to add elements of terror, pain, or disgrace to the death penalty, petitioners' challenge must fail. Pp. 1–15.

JUSTICE BREYER concluded that there cannot be found, either in the record or in the readily available literature, sufficient grounds to believe that Kentucky's lethal injection method creates a significant risk of unnecessary suffering. Although the death penalty has serious risks—*e.g.,* that the wrong person may be executed, that unwarranted animus about the victims' race, for example, may play a role, and that those convicted will find themselves on death row for many years—the penalty's lawfulness is not before the Court. And petitioners' proof and evidence, while giving rise to legitimate concern, do not show that Kentucky's execution method amounts to "cruel and unusual punishmen[t]." Pp. 1–7.

ROBERTS, C. J., announced the judgment of the Court and delivered an opinion, in which KENNEDY and ALITO, JJ., joined. ALITO, J., filed a concurring opinion. STEVENS, J., filed an opinion concurring in the judgment. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined. THOMAS, J., filed an opinion concurring in the judgment, in which SCALIA, J., joined. BREYER, J., filed an opinion concurring in the judgment. GINSBURG, J., filed a dissenting opinion, in which SOUTER, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 07–5439

———

RALPH BAZE AND THOMAS C. BOWLING, PETI-
TIONERS *v.* JOHN D. REES, COMMISSIONER,
KENTUCKY DEPARTMENT OF
CORRECTIONS, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF KENTUCKY

[April 16, 2008]

CHIEF JUSTICE ROBERTS announced the judgment of the Court and delivered an opinion, in which JUSTICE KENNEDY and JUSTICE ALITO join.

Like 35 other States and the Federal Government, Kentucky has chosen to impose capital punishment for certain crimes. As is true with respect to each of these States and the Federal Government, Kentucky has altered its method of execution over time to more humane means of carrying out the sentence. That progress has led to the use of lethal injection by every jurisdiction that imposes the death penalty.

Petitioners in this case—each convicted of double homicide—acknowledge that the lethal injection procedure, if applied as intended, will result in a humane death. They nevertheless contend that the lethal injection protocol is unconstitutional under the Eighth Amendment's ban on "cruel and unusual punishments," because of the risk that the protocol's terms might not be properly followed, resulting in significant pain. They propose an alternative proto-

col, one that they concede has not been adopted by any State and has never been tried.

The trial court held extensive hearings and entered detailed Findings of Fact and Conclusions of Law. It recognized that "[t]here are no methods of legal execution that are satisfactory to those who oppose the death penalty on moral, religious, or societal grounds," but concluded that Kentucky's procedure "complies with the constitutional requirements against cruel and unusual punishment." App. 769. The State Supreme Court affirmed. We too agree that petitioners have not carried their burden of showing that the risk of pain from maladministration of a concededly humane lethal injection protocol, and the failure to adopt untried and untested alternatives, constitute cruel and unusual punishment. The judgment below is affirmed.

## I
### A

By the middle of the 19th century, "hanging was the 'nearly universal form of execution' in the United States." *Campbell* v. *Wood*, 511 U. S. 1119 (1994) (Blackmun, J., dissenting from denial of certiorari) (quoting *State* v. *Frampton*, 95 Wash. 2d 469, 492, 627 P. 2d 922, 934 (1981)); Denno, Getting to Death: Are Executions Constitutional? 82 Iowa L. Rev. 319, 364 (1997) (counting 48 States and Territories that employed hanging as a method of execution). In 1888, following the recommendation of a commission empaneled by the Governor to find "'the most humane and practical method known to modern science of carrying into effect the sentence of death,'" New York became the first State to authorize electrocution as a form of capital punishment. *Glass* v. *Louisiana*, 471 U. S. 1080, 1082, and n. 4 (1985) (Brennan, J., dissenting from denial of certiorari); Denno, *supra*, at 373. By 1915, 11 other States had followed suit, motivated by the "well-grounded

belief that electrocution is less painful and more humane than hanging." *Malloy* v. *South Carolina*, 237 U. S. 180, 185 (1915).

Electrocution remained the predominant mode of execution for nearly a century, although several methods, including hanging, firing squad, and lethal gas were in use at one time. Brief for Fordham University School of Law et al. as *Amici Curiae* 5–9 (hereinafter Fordham Brief). Following the 9-year hiatus in executions that ended with our decision in *Gregg* v. *Georgia*, 428 U. S. 153 (1976), however, state legislatures began responding to public calls to reexamine electrocution as a means of assuring a humane death. See S. Banner, The Death Penalty: An American History 192–193, 296–297 (2002). In 1977, legislators in Oklahoma, after consulting with the head of the anesthesiology department at the University of Oklahoma College of Medicine, introduced the first bill proposing lethal injection as the State's method of execution. See Brief for Petitioners 4; Fordham Brief 21–22. A total of 36 States have now adopted lethal injection as the exclusive or primary means of implementing the death penalty, making it by far the most prevalent method of execution in the United States.[1] It is also the method used by the

—————————

[1] Twenty-seven of the 36 States that currently provide for capital punishment require execution by lethal injection as the sole method. See Ariz. Rev. Stat. Ann. §13–704 (West 2001); Ark. Code Ann. §5–4–617 (2006); Colo. Rev. Stat. Ann. §18–1.3–1202 (2007); Conn. Gen. Stat. §54–100 (2007); Del. Code Ann., Tit. 11, §4209 (2006 Supp.); Ga. Code Ann. §17–10–38 (2004); Ill. Comp. Stat., ch. 725, §5/119–5 (West 2006); Ind. Code §35–38–6–1 (West 2004); Kan. Stat. Ann. §22–4001 (2006 Cum. Supp.); Ky. Rev. Stat. Ann. §431.220 (West 2006); La. Stat. Ann. §15:569 (West 2005); Md. Crim. Law Code Ann. §2–303 (Lexis Supp. 2007); Miss. Code Ann. §99–19–51 (2007); Mont. Code Ann. §46–19–103 (2007); Nev. Rev. Stat. §176.355 (2007); N. J. Stat. Ann. §2C:49–2 (West 2007) (repealed Dec. 17, 2007); N. M. Stat. Ann. §31–14–11 (2000); N. C. Gen. Stat. Ann. §15–187 (Lexis 2007); N. Y. Correc. Law Ann. §658 (West 2003) (held unconstitutional in *People* v. *LaValle*, 3 N. Y. 3d

Federal Government.  See 18 U. S. C. §3591 *et seq.* (2000 ed. and Supp. V); App. to Brief for United States as *Amicus Curiae* 1a–6a (lethal injection protocol used by the Federal Bureau of Prisons).

Of these 36 States, at least 30 (including Kentucky) use the same combination of three drugs in their lethal injection protocols.  See *Workman* v. *Bredesen*, 486 F. 3d 896, 902 (CA6 2007).  The first drug, sodium thiopental (also known as Pentathol), is a fast-acting barbiturate sedative that induces a deep, comalike unconsciousness when given in the amounts used for lethal injection.  App. 762–763, 631–632.  The second drug, pancuronium bromide (also

—————

88, 130–131, 817 N. E. 2d 341, 367 (2004)); Ohio Rev. Code Ann. §2949.22 (Lexis 2006); Okla. Stat., Tit. 22, §1014 (West 2001); Ore. Rev. Stat. §137.473 (2003); Pa. Stat. Ann., Tit. 61, §3004 (Purdon 1999); S. D. Codified Laws §23A–27A–32 (Supp. 2007); Tenn. Code Ann. §40–23–114 (2006); Tex. Code Crim. Proc. Ann., Art. 43.14 (Vernon 2006 Supp. Pamphlet); Utah Code Ann. §77–18–5.5 (Lexis Supp. 2007); Wyo. Stat. Ann. §7–13–904 (2007).  Nine States allow for lethal injection in addition to an alternative method, such as electrocution, see Ala. Code §§15–18–82 to 82.1 (Supp. 2007); Fla. Stat. §922.105 (2006); S. C. Code Ann. §24–3–530 (2007); Va. Code Ann. §53.1–234 (Lexis Supp. 2007), hanging, see N. H. Rev. Stat. Ann. §630:5 (2007); Wash. Rev. Code §10.95.180 (2006), lethal gas, see Cal. Penal Code Ann. §3604 (West 2000); Mo. Rev. Stat. §546.720 (2007 Cum. Supp.), or firing squad, see Idaho Code §19–2716 (Lexis 2004).  Nebraska is the only State whose statutes specify electrocution as the sole method of execution, see Neb. Rev. Stat. §29–2532 (1995), but the Nebraska Supreme Court recently struck down that method under the Nebraska Constitution, see *State* v. *Mata*, No. S–05–1268, 2008 WL 351695, *40 (2008).

Although it is undisputed that the States using lethal injection adopted the protocol first developed by Oklahoma without significant independent review of the procedure, it is equally undisputed that, in moving to lethal injection, the States were motivated by a desire to find a more humane alternative to then-existing methods.  See Fordham Brief 2–3.  In this regard, Kentucky was no different.  See *id.*, at 29–30 (quoting statement by the State Representative who sponsored the bill to replace electrocution with lethal injection in Kentucky: "if we are going to do capital punishment, it needs to be done in the most humane manner" (internal quotation marks omitted)).

known as Pavulon), is a paralytic agent that inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops respiration. *Id.,* at 763. Potassium chloride, the third drug, interferes with the electrical signals that stimulate the contractions of the heart, inducing cardiac arrest. *Ibid.* The proper administration of the first drug ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs. *Id.,* at 493–494, 541, 558–559.

B

Kentucky replaced electrocution with lethal injection in 1998. 1998 Ky. Acts ch. 220, p. 777. The Kentucky statute does not specify the drugs or categories of drugs to be used during an execution, instead mandating that "every death sentence shall be executed by continuous intravenous injection of a substance or combination of substances sufficient to cause death." Ky. Rev. Stat. Ann. §431.220(1)(a) (West 2006). Prisoners sentenced before 1998 have the option of electing either electrocution or lethal injection, but lethal injection is the default if—as is the case with petitioners—the prisoner refuses to make a choice at least 20 days before the scheduled execution. §431.220(1)(b). If a court invalidates Kentucky's lethal injection method, Kentucky law provides that the method of execution will revert to electrocution. §431.223.

Shortly after the adoption of lethal injection, officials working for the Kentucky Department of Corrections set about developing a written protocol to comply with the requirements of §431.220(1)(a). Kentucky's protocol called for the injection of 2 grams of sodium thiopental, 50 milligrams of pancuronium bromide, and 240 milliequivalents of potassium chloride. In 2004, as a result of this litigation, the department chose to increase the amount of sodium thiopental from 2 grams to 3 grams. App. 762–

763, 768.  Between injections, members of the execution team flush the intravenous (IV) lines with 25 milligrams of saline to prevent clogging of the lines by precipitates that may form when residual sodium thiopental comes into contact with pancuronium bromide.  *Id.,* at 761, 763–764.  The protocol reserves responsibility for inserting the IV catheters to qualified personnel having at least one year of professional experience.  *Id.,* at 984.  Currently, Kentucky uses a certified phlebotomist and an emergency medical technician (EMT) to perform the venipunctures necessary for the catheters.  *Id.,* at 761–762.  They have up to one hour to establish both primary and secondary peripheral intravenous sites in the arm, hand, leg, or foot of the inmate.  *Id.,* at 975–976.  Other personnel are responsible for mixing the solutions containing the three drugs and loading them into syringes.  *Id.*, at 761.

Kentucky's execution facilities consist of the execution chamber, a control room separated by a one-way window, and a witness room.  *Id.*, at 203.  The warden and deputy warden remain in the execution chamber with the prisoner, who is strapped to a gurney.  The execution team administers the drugs remotely from the control room through five feet of IV tubing.  *Id.,* at 286.  If, as determined by the warden and deputy warden through visual inspection, the prisoner is not unconscious within 60 seconds following the delivery of the sodium thiopental to the primary IV site, a new 3-gram dose of thiopental is administered to the secondary site before injecting the pancuronium and potassium chloride.  *Id.,* at 978–979.  In addition to assuring that the first dose of thiopental is successfully administered, the warden and deputy warden also watch for any problems with the IV catheters and tubing.

A physician is present to assist in any effort to revive the prisoner in the event of a last-minute stay of execution.  *Id.,* at 764.  By statute, however, the physician is

prohibited from participating in the "conduct of an execution," except to certify the cause of death. Ky. Rev. Stat. Ann. §431.220(3). An electrocardiogram (EKG) verifies the death of the prisoner. App. 764. Only one Kentucky prisoner, Eddie Lee Harper, has been executed since the Commonwealth adopted lethal injection. There were no reported problems at Harper's execution.

C

Petitioners Ralph Baze and Thomas C. Bowling were each convicted of two counts of capital murder and sentenced to death. The Kentucky Supreme Court upheld their convictions and sentences on direct appeal. See *Baze* v. *Commonwealth*, 965 S. W. 2d 817, 819–820, 826 (1997), cert. denied, 523 U. S. 1083 (1998); *Bowling* v. *Commonwealth*, 873 S. W. 2d 175, 176–177, 182 (1993), cert. denied, 513 U. S. 862 (1994).

After exhausting their state and federal collateral remedies, Baze and Bowling sued three state officials in the Franklin Circuit Court for the Commonwealth of Kentucky, seeking to have Kentucky's lethal injection protocol declared unconstitutional. After a 7-day bench trial during which the trial court received the testimony of approximately 20 witnesses, including numerous experts, the court upheld the protocol, finding there to be minimal risk of various claims of improper administration of the protocol. App. 765–769. On appeal, the Kentucky Supreme Court stated that a method of execution violates the Eighth Amendment when it "creates a substantial risk of wanton and unnecessary infliction of pain, torture or lingering death." 217 S. W. 3d 207, 209 (2006). Applying that standard, the court affirmed. *Id.*, at 212.

We granted certiorari to determine whether Kentucky's lethal injection protocol satisfies the Eighth Amendment. 551 U. S. ___ (2007). We hold that it does.

## II

The Eighth Amendment to the Constitution, applicable to the States through the Due Process Clause of the Fourteenth Amendment, see *Robinson* v. *California*, 370 U. S. 660, 666 (1962), provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." We begin with the principle, settled by *Gregg*, that capital punishment is constitutional. See 428 U. S., at 177 (joint opinion of Stewart, Powell, and STEVENS, JJ.). It necessarily follows that there must be a means of carrying it out. Some risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure. It is clear, then, that the Constitution does not demand the avoidance of all risk of pain in carrying out executions.

Petitioners do not claim that it does. Rather, they contend that the Eighth Amendment prohibits procedures that create an "unnecessary risk" of pain. Brief for Petitioners 38. Specifically, they argue that courts must evaluate "(a) the severity of pain risked, (b) the likelihood of that pain occurring, and (c) the extent to which alternative means are feasible, either by modifying existing execution procedures or adopting alternative procedures." *Ibid.* Petitioners envision that the quantum of risk necessary to make out an Eighth Amendment claim will vary according to the severity of the pain and the availability of alternatives, Reply Brief for Petitioners 23–24, n. 9, but that the risk must be "significant" to trigger Eighth Amendment scrutiny, see Brief for Petitioners 39–40; Reply Brief for Petitioners 25–26.

Kentucky responds that this "unnecessary risk" standard is tantamount to a requirement that States adopt the "'least risk'" alternative in carrying out an execution, a standard the Commonwealth contends will cast recurring constitutional doubt on any procedure adopted by the

States. Brief for Respondents 29, 35. Instead, Kentucky urges the Court to approve the "'substantial risk'" test used by the courts below. *Id.*, at 34–35.

A

This Court has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment. In *Wilkerson* v. *Utah*, 99 U. S. 130 (1879), we upheld a sentence to death by firing squad imposed by a territorial court, rejecting the argument that such a sentence constituted cruel and unusual punishment. *Id.*, at 134–135. We noted there the difficulty of "defin[ing] with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted." *Id.*, at 135–136. Rather than undertake such an effort, the *Wilkerson* Court simply noted that "it is safe to affirm that punishments of torture, . . . and all others in the same line of unnecessary cruelty, are forbidden" by the Eighth Amendment. *Id.*, at 136. By way of example, the Court cited cases from England in which "terror, pain, or disgrace were sometimes superadded" to the sentence, such as where the condemned was "embowelled alive, beheaded, and quartered," or instances of "public dissection in murder, and burning alive." *Id.*, at 135. In contrast, we observed that the firing squad was routinely used as a method of execution for military officers. *Id.*, at 137. What each of the forbidden punishments had in common was the deliberate infliction of pain for the sake of pain— "superadd[ing]" pain to the death sentence through torture and the like.

We carried these principles further in *In re Kemmler*, 136 U. S. 436 (1890). There we rejected an opportunity to incorporate the Eighth Amendment against the States in a challenge to the first execution by electrocution, to be carried out by the State of New York. *Id.*, at 449. In

passing over that question, however, we observed that "[p]unishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life." *Id.*, at 447. We noted that the New York statute adopting electrocution as a method of execution "was passed in the effort to devise a more humane method of reaching the result." *Ibid.*

B

Petitioners do not claim that lethal injection or the proper administration of the particular protocol adopted by Kentucky by themselves constitute the cruel or wanton infliction of pain. Quite the contrary, they concede that "if performed properly," an execution carried out under Kentucky's procedures would be "humane and constitutional." Brief for Petitioners 31. That is because, as counsel for petitioners admitted at oral argument, proper administration of the first drug, sodium thiopental, eliminates any meaningful risk that a prisoner would experience pain from the subsequent injections of pancuronium and potassium chloride. See Tr. of Oral Arg. 5; App. 493–494 (testimony of petitioners' expert that, if sodium thiopental is "properly administered" under the protocol, "[i]n virtually every case, then that would be a humane death").

Instead, petitioners claim that there is a significant risk that the procedures will *not* be properly followed—in particular, that the sodium thiopental will not be properly administered to achieve its intended effect—resulting in severe pain when the other chemicals are administered. Our cases recognize that subjecting individuals to a risk of future harm—not simply actually inflicting pain—can qualify as cruel and unusual punishment. To establish that such exposure violates the Eighth Amendment, how-

ever, the conditions presenting the risk must be "*sure or very likely* to cause serious illness and needless suffering," and give rise to "sufficiently *imminent* dangers." *Helling* v. *McKinney*, 509 U. S. 25, 33, 34–35 (1993) (emphasis added). We have explained that to prevail on such a claim there must be a "substantial risk of serious harm," an "objectively intolerable risk of harm" that prevents prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment." *Farmer* v. *Brennan*, 511 U. S. 825, 842, 846, and n. 9 (1994).

Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of "objectively intolerable risk of harm" that qualifies as cruel and unusual. In *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459 (1947), a plurality of the Court upheld a second attempt at executing a prisoner by electrocution after a mechanical malfunction had interfered with the first attempt. The principal opinion noted that "[a]ccidents happen for which no man is to blame," *id.*, at 462, and concluded that such "an accident, with no suggestion of malevolence," *id.*, at 463, did not give rise to an Eighth Amendment violation, *id.*, at 463–464.

As Justice Frankfurter noted in a separate opinion based on the Due Process Clause, however, "a hypothetical situation" involving "a series of abortive attempts at electrocution" would present a different case. *Id.*, at 471 (concurring opinion). In terms of our present Eighth Amendment analysis, such a situation—unlike an "innocent misadventure," *id.*, at 470—would demonstrate an "objectively intolerable risk of harm" that officials may not ignore. See *Farmer*, 511 U. S., at 846, and n. 9. In other words, an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a "substantial risk of

serious harm." *Id.*, at 842.

## C

Much of petitioners' case rests on the contention that they have identified a significant risk of harm that can be eliminated by adopting alternative procedures, such as a one-drug protocol that dispenses with the use of pancuronium and potassium chloride, and additional monitoring by trained personnel to ensure that the first dose of sodium thiopental has been adequately delivered. Given what our cases have said about the nature of the risk of harm that is actionable under the Eighth Amendment, a condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative.

Permitting an Eighth Amendment violation to be established on such a showing would threaten to transform courts into boards of inquiry charged with determining "best practices" for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology. Such an approach finds no support in our cases, would embroil the courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing their execution procedures—a role that by all accounts the States have fulfilled with an earnest desire to provide for a progressively more humane manner of death. See *Bell* v. *Wolfish*, 441 U. S. 520, 562 (1979) ("The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government"). Accordingly, we reject petitioners' proposed "unnecessary risk" standard, as well as the dissent's "untoward" risk variation. See *post*, at 2, 11 (opinion of GINSBURG, J.).[2]

—————

[2] The difficulties inherent in such approaches are exemplified by the controversy surrounding the study of lethal injection published in the

Opinion of ROBERTS, C. J.

Instead, the proffered alternatives must effectively address a "substantial risk of serious harm." *Farmer*, *supra,* at 842. To qualify, the alternative procedure must be feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain. If a State refuses to adopt such an alternative in the face of these documented advantages, without a legitimate penological justification for adhering to its current method of execution, then a State's refusal to change its method can be viewed as "cruel and unusual" under the Eighth Amendment.[3]

————————

April 2005 edition of the British medical journal the Lancet. After examining thiopental concentrations in toxicology reports based on blood samples drawn from 49 executed inmates, the study concluded that "most of the executed inmates had concentrations that would not be expected to produce a surgical plane of anaesthesia, and 21 (43%) had concentrations consistent with consciousness." Koniaris, Zimmers, Lubarsky, & Sheldon, Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412, 1412–1413. The study was widely cited around the country in motions to stay executions and briefs on the merits. See, *e.g.,* Denno, The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty, 76 Ford. L. Rev. 49, 105, n. 366 (2007) (collecting cases in which claimants cited the Lancet study). But shortly after the Lancet study appeared, peer responses by seven medical researchers criticized the methodology supporting the original conclusions. See Groner, Inadequate Anaesthesia in Lethal Injection for Execution, 366 Lancet 1073–1074 (Sept. 2005). These researchers noted that because the blood samples were taken "several hours to days after" the inmates' deaths, the postmortem concentrations of thiopental—a fat-soluble compound that passively diffuses from blood into tissue—could not be relied on as accurate indicators for concentrations during life. *Id.*, at 1073. The authors of the original study responded to defend their methodology. *Id.*, at 1074–1076. See also *post*, at 2–4 (BREYER, J., concurring in judgment).

We do not purport to take sides in this dispute. We cite it only to confirm that a "best practices" approach, calling for the weighing of relative risks without some measure of deference to a State's choice of execution procedures, would involve the courts in debatable matters far exceeding their expertise.

[3] JUSTICE THOMAS agrees that courts have neither the authority nor

## III

In applying these standards to the facts of this case, we note at the outset that it is difficult to regard a practice as "objectively intolerable" when it is in fact widely tolerated. Thirty-six States that sanction capital punishment have adopted lethal injection as the preferred method of execution. The Federal Government uses lethal injection as well. See *supra*, at 3–4, and n. 1. This broad consensus goes not just to the method of execution, but also to the specific three-drug combination used by Kentucky. Thirty States, as well as the Federal Government, use a series of sodium thiopental, pancuronium bromide, and potassium chloride, in varying amounts. See *supra*, at 4. No State uses or has ever used the alternative one-drug protocol belatedly urged by petitioners. This consensus is probative but not conclusive with respect to that aspect of the alternatives proposed by petitioners.

In order to meet their "heavy burden" of showing that Kentucky's procedure is "cruelly inhumane," *Gregg*, 428 U. S., at 175 (joint opinion of Stewart, Powell, and STEVENS, JJ.), petitioners point to numerous aspects of the protocol that they contend create opportunities for error. Their claim hinges on the improper administration of the first drug, sodium thiopental. It is uncontested that, failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the

the expertise to function as boards of inquiry determining best practices for executions, see *post*, at 9 (opinion concurring in judgment) (quoting this opinion); *post*, at 13, but contends that the standard we adopt inevitably poses such concerns. In our view, those concerns are effectively addressed by the threshold requirement reflected in our cases of a "'substantial risk of serious harm'" or an "'objectively intolerable risk of harm,'" see *supra*, at 11, and by the substantive requirements in the articulated standard.

injection of potassium chloride.  See Tr. of Oral Arg. 27. We agree with the state trial court and State Supreme Court, however, that petitioners have not shown that the risk of an inadequate dose of the first drug is substantial. And we reject the argument that the Eighth Amendment requires Kentucky to adopt the untested alternative procedures petitioners have identified.

A

Petitioners contend that there is a risk of improper administration of thiopental because the doses are difficult to mix into solution form and load into syringes; because the protocol fails to establish a rate of injection, which could lead to a failure of the IV; because it is possible that the IV catheters will infiltrate into surrounding tissue, causing an inadequate dose to be delivered to the vein; because of inadequate facilities and training; and because Kentucky has no reliable means of monitoring the anesthetic depth of the prisoner after the sodium thiopental has been administered.  Brief for Petitioners 12–20.

As for the risk that the sodium thiopental would be improperly prepared, petitioners contend that Kentucky employs untrained personnel who are unqualified to calculate and mix an adequate dose, especially in light of the omission of volume and concentration amounts from the written protocol.  *Id.*, at 45–46.  The state trial court, however, specifically found that "[i]f the manufacturers' instructions for reconstitution of Sodium Thiopental are followed, . . . there would be minimal risk of improper mixing, despite converse testimony that a layperson would have difficulty performing this task."  App. 761.  We cannot say that this finding is clearly erroneous, see *Hernandez* v. *New York*, 500 U. S. 352, 366 (1991) (plurality opinion), particularly when that finding is substantiated by expert testimony describing the task of reconstituting powder sodium thiopental into solution form as "[n]ot

difficult at all. . . . You take a liquid, you inject it into a vial with the powder, then you shake it up until the powder dissolves and, you're done.  The instructions are on the package insert."  5 Tr. 695 (Apr. 19, 2005).

Likewise, the asserted problems related to the IV lines do not establish a sufficiently substantial risk of harm to meet the requirements of the Eighth Amendment.  Kentucky has put in place several important safeguards to ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner.  The most significant of these is the written protocol's requirement that members of the IV team must have at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman.  App. 984.  Kentucky currently uses a phlebotomist and an EMT, personnel who have daily experience establishing IV catheters for inmates in Kentucky's prison population.  *Id.,* at 273–274; Tr. of Oral Arg. 27–28.  Moreover, these IV team members, along with the rest of the execution team, participate in at least 10 practice sessions per year.  App. 984.  These sessions, required by the written protocol, encompass a complete walk-through of the execution procedures, including the siting of IV catheters into volunteers.  *Ibid.*  In addition, the protocol calls for the IV team to establish both primary and backup lines and to prepare two sets of the lethal injection drugs before the execution commences.  *Id.,* at 975.  These redundant measures ensure that if an insufficient dose of sodium thiopental is initially administered through the primary line, an additional dose can be given through the backup line before the last two drugs are injected.  *Id.,* at 279–280, 337–338, 978–979.

The IV team has one hour to establish both the primary and backup IVs, a length of time the trial court found to be "not excessive but rather necessary," *id.,* at 762, contrary to petitioners' claim that using an IV inserted after any

"more than ten or fifteen minutes of unsuccessful attempts is dangerous because the IV is almost certain to be unreliable," Brief for Petitioners 47. And, in any event, merely because the protocol gives the IV team one hour to establish intravenous access does not mean that team members are required to spend the entire hour in a futile attempt to do so. The qualifications of the IV team also substantially reduce the risk of IV infiltration.

In addition, the presence of the warden and deputy warden in the execution chamber with the prisoner allows them to watch for signs of IV problems, including infiltration. Three of the Commonwealth's medical experts testified that identifying signs of infiltration would be "very obvious," even to the average person, because of the swelling that would result. App. 385–386. See *id.,* at 353, 600–601. Kentucky's protocol specifically requires the warden to redirect the flow of chemicals to the backup IV site if the prisoner does not lose consciousness within 60 seconds. *Id.,* at 978–979. In light of these safeguards, we cannot say that the risks identified by petitioners are so substantial or imminent as to amount to an Eighth Amendment violation.

B

Nor does Kentucky's failure to adopt petitioners' proposed alternatives demonstrate that the Commonwealth's execution procedure is cruel and unusual.

First, petitioners contend that Kentucky could switch from a three-drug protocol to a one-drug protocol by using a single dose of sodium thiopental or other barbiturate. Brief for Petitioners 51–57. That alternative was not proposed to the state courts below.[4] As a result, we are

_____

[4] Petitioners did allude to an "alternative chemical or combination of chemicals" that could replace Kentucky's three-drug protocol in their post-trial brief, see App. 684, but based on the arguments presented there, it is clear they intended to refer only to other, allegedly less

left without any findings on the effectiveness of petition-
ers' barbiturate-only protocol, despite scattered references
in the trial testimony to the sole use of sodium thiopental
or pentobarbital as a preferred method of execution. See
Reply Brief for Petitioners 18, n. 6.

In any event, the Commonwealth's continued use of the
three-drug protocol cannot be viewed as posing an "objec-
tively intolerable risk" when no other State has adopted
the one-drug method and petitioners proffered no study
showing that it is an equally effective manner of imposing
a death sentence. See App. 760–761, n. 8 ("Plaintiffs have
not presented any scientific study indicating a better
method of execution by lethal injection"). Indeed, the
State of Tennessee, after reviewing its execution proce-
dures, rejected a proposal to adopt a one-drug protocol
using sodium thiopental. The State concluded that the
one-drug alternative would take longer than the three-
drug method and that the "required dosage of sodium
thiopental would be less predictable and more variable
when it is used as the sole mechanism for producing death
. . . ." *Workman*, 486 F. 3d, at 919 (Appendix A). We need
not endorse the accuracy of those conclusions to note
simply that the comparative efficacy of a one-drug method
of execution is not so well established that Kentucky's
failure to adopt it constitutes a violation of the Eighth
Amendment.

Petitioners also contend that Kentucky should omit the
second drug, pancuronium bromide, because it serves no
therapeutic purpose while suppressing muscle movements

———————

painful drugs that could substitute for potassium chloride as a heart-
stopping agent, see *id.,* at 701. Likewise, the only alternatives to the
three-drug protocol presented to the Kentucky Supreme Court were
those that replaced potassium chloride with other drugs for inducing
cardiac arrest, or that omitted pancuronium bromide, or that added an
analgesic to relieve pain. See Brief for Appellants in No. 2005–SC–
00543, pp. 38, 39, 40.

that could reveal an inadequate administration of the first drug. The state trial court, however, specifically found that pancuronium serves two purposes. First, it prevents involuntary physical movements during unconsciousness that may accompany the injection of potassium chloride. App. 763. The Commonwealth has an interest in preserving the dignity of the procedure, especially where convulsions or seizures could be misperceived as signs of consciousness or distress. Second, pancuronium stops respiration, hastening death. *Ibid.* Kentucky's decision to include the drug does not offend the Eighth Amendment.[5]

Petitioners' barbiturate-only protocol, they contend, is not untested; it is used routinely by veterinarians in putting animals to sleep. Moreover, 23 States, including Kentucky, bar veterinarians from using a neuromuscular paralytic agent like pancuronium bromide, either expressly or, like Kentucky, by specifically directing the use of a drug like sodium pentobarbital. See Brief for Dr. Kevin Concannon et al. as *Amici Curiae* 18, n. 5. If pancuronium is too cruel for animals, the argument goes, then it must be too cruel for the condemned inmate. Whatever rhetorical force the argument carries, see *Workman, supra,* at 909 (describing the comparison to animal euthanasia as "more of a debater's point"), it overlooks the States' legitimate interest in providing for a quick, certain death. In the Netherlands, for example, where physician-assisted euthanasia is permitted, the Royal Dutch Society for the Advancement of Pharmacy recommends the use of a muscle relaxant (such as pancuronium dibromide) in addition to thiopental in order to prevent a prolonged, undignified death. See Kimsma, Euthanasia and Euthanizing Drugs

———————

[5] JUSTICE STEVENS's conclusion that the risk addressed by pancuronium bromide is "vastly outweighed" by the risk of pain at issue here, see *post*, at 3 (opinion concurring in judgment), depends, of course, on the magnitude of the risk of such pain. As explained, that risk is insignificant in light of the safeguards Kentucky has adopted.

in The Netherlands, reprinted in Drug Use in Assisted Suicide and Euthanasia 193, 200, 204 (M. Battin & A. Lipman eds. 1996). That concern may be less compelling in the veterinary context, and in any event other methods approved by veterinarians—such as stunning the animal or severing its spinal cord, see 6 Tr. 758–759 (Apr. 20, 2005)—make clear that veterinary practice for animals is not an appropriate guide to humane practices for humans.

Petitioners also fault the Kentucky protocol for lacking a systematic mechanism for monitoring the "anesthetic depth" of the prisoner. Under petitioners' scheme, qualified personnel would employ monitoring equipment, such as a Bispectral Index (BIS) monitor, blood pressure cuff, or EKG to verify that a prisoner has achieved sufficient unconsciousness before injecting the final two drugs. The visual inspection performed by the warden and deputy warden, they maintain, is an inadequate substitute for the more sophisticated procedures they envision. Brief for Petitioners 19, 58.

At the outset, it is important to reemphasize that a proper dose of thiopental obviates the concern that a prisoner will not be sufficiently sedated. All the experts who testified at trial agreed on this point. The risks of failing to adopt additional monitoring procedures are thus even more "remote" and attenuated than the risks posed by the alleged inadequacies of Kentucky's procedures designed to ensure the delivery of thiopental. See *Hamilton* v. *Jones*, 472 F. 3d 814, 817 (CA10 2007) *(per curiam)*; *Taylor* v. *Crawford*, 487 F. 3d 1072, 1084 (CA8 2007).

But more than this, Kentucky's expert testified that a blood pressure cuff would have no utility in assessing the level of the prisoner's unconsciousness following the introduction of sodium thiopental, which depresses circulation. App. 578. Furthermore, the medical community has yet to endorse the use of a BIS monitor, which measures brain function, as an indication of anesthetic awareness. Ameri-

can Society of Anesthesiologists, Practice Advisory for Intraoperative Awareness and Brain Function Monitoring, 104 Anesthesiology 847, 855 (Apr. 2006); see *Brown* v. *Beck*, 445 F. 3d 752, 754–755 (CA4 2006) (Michael, J., dissenting). The asserted need for a professional anesthesiologist to interpret the BIS monitor readings is nothing more than an argument against the entire procedure, given that both Kentucky law, see Ky. Rev. Stat. Ann. §431.220(3), and the American Society of Anesthesiologists' own ethical guidelines, see Brief for American Society of Anesthesiologists as *Amicus Curiae* 2–3, prohibit anesthesiologists from participating in capital punishment. Nor is it pertinent that the use of a blood pressure cuff and EKG is "the standard of care in surgery requiring anesthesia," as the dissent points out. *Post*, at 6. Petitioners have not shown that these supplementary procedures, drawn from a different context, are necessary to avoid a substantial risk of suffering.

The dissent believes that rough-and-ready tests for checking consciousness—calling the inmate's name, brushing his eyelashes, or presenting him with strong, noxious odors—could materially decrease the risk of administering the second and third drugs before the sodium thiopental has taken effect. See *ibid.* Again, the risk at issue is already attenuated, given the steps Kentucky has taken to ensure the proper administration of the first drug. Moreover, the scenario the dissent posits involves a level of unconsciousness allegedly sufficient to avoid detection of improper administration of the anesthesia under Kentucky's procedure, but not sufficient to prevent pain. See *post*, at 9–10. There is no indication that the basic tests the dissent advocates can make such fine distinctions. If these tests are effective only in determining whether the sodium thiopental has entered the inmate's bloodstream, see *post*, at 6, the record confirms that the visual inspection of the IV site under Kentucky's procedure achieves

that objective. See *supra*, at 17.[6]

The dissent would continue the stay of these executions (and presumably the many others held in abeyance pending decision in this case) and send the case back to the lower courts to determine whether such added measures redress an "untoward" risk of pain. *Post*, at 11. But an inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the State could take as a failsafe for other, independently adequate measures. This approach would serve no meaningful purpose and would frustrate the State's legitimate interest in carrying out a sentence of death in a timely manner. See *Baze* v. *Parker*, 371 F. 3d 310, 317 (CA6 2004) (petitioner Baze sentenced to death in 1994); *Bowling* v. *Parker*, 138 F. Supp. 2d 821, 840 (ED Ky. 2001) (petitioner Bowling sentenced to death in 1991).

JUSTICE STEVENS suggests that our opinion leaves the disposition of other cases uncertain, see *post*, at 1, but the standard we set forth here resolves more challenges than he acknowledges. A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain. He must show that the risk is substantial when compared to the known and available alternatives. A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.

---

[6] Resisting this point, the dissent rejects the expert testimony that problems with the intravenous administration of sodium thiopental would be obvious, see *post*, at 10, testimony based not only on the pain that would result from injecting the first drug into tissue rather than the vein, see App. 600–601, but also on the swelling that would occur, see *id.*, at 353. See also *id.*, at 385–386. Neither of these expert conclusions was disputed below.

\*    \*    \*

Reasonable people of good faith disagree on the morality and efficacy of capital punishment, and for many who oppose it, no method of execution would ever be acceptable. But as Justice Frankfurter stressed in *Resweber*, "[o]ne must be on guard against finding in personal disapproval a reflection of more or less prevailing condemnation." 329 U. S., at 471 (concurring opinion). This Court has ruled that capital punishment is not prohibited under our Constitution, and that the States may enact laws specifying that sanction. "[T]he power of a State to pass laws means little if the State cannot enforce them." *McCleskey* v. *Zant*, 499 U. S. 467, 491 (1991). State efforts to implement capital punishment must certainly comply with the Eighth Amendment, but what that Amendment prohibits is wanton exposure to "objectively intolerable risk," *Farmer*, 511 U. S., at 846, and n. 9, not simply the possibility of pain.

Kentucky has adopted a method of execution believed to be the most humane available, one it shares with 35 other States. Petitioners agree that, if administered as intended, that procedure will result in a painless death. The risks of maladministration they have suggested—such as improper mixing of chemicals and improper setting of IVs by trained and experienced personnel—cannot remotely be characterized as "objectively intolerable." Kentucky's decision to adhere to its protocol despite these asserted risks, while adopting safeguards to protect against them, cannot be viewed as probative of the wanton infliction of pain under the Eighth Amendment. Finally, the alternative that petitioners belatedly propose has problems of its own, and has never been tried by a single State.

Throughout our history, whenever a method of execution has been challenged in this Court as cruel and unusual, the Court has rejected the challenge. Our society has nonetheless steadily moved to more humane methods

of carrying out capital punishment. The firing squad, hanging, the electric chair, and the gas chamber have each in turn given way to more humane methods, culminating in today's consensus on lethal injection. *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 657 (1992) (STEVENS, J., dissenting); App. 755. The broad framework of the Eighth Amendment has accommodated this progress toward more humane methods of execution, and our approval of a particular method in the past has not precluded legislatures from taking the steps they deem appropriate, in light of new developments, to ensure humane capital punishment. There is no reason to suppose that today's decision will be any different.[7]

The judgment below concluding that Kentucky's procedure is consistent with the Eighth Amendment is, accordingly, affirmed.

*It is so ordered.*

———————

[7]We do not agree with JUSTICE STEVENS that anything in our opinion undermines or remotely addresses the validity of capital punishment. See *post*, at 11. The fact that society has moved to progressively more humane methods of execution does not suggest that capital punishment itself no longer serves valid purposes; we would not have supposed that the case for capital punishment was stronger when it was imposed predominantly by hanging or electrocution.

# SUPREME COURT OF THE UNITED STATES

——————

No. 07–5439

——————

## RALPH BAZE AND THOMAS C. BOWLING, PETITIONERS *v.* JOHN D. REES, COMMISSIONER, KENTUCKY DEPARTMENT OF CORRECTIONS, ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KENTUCKY

[April 16, 2008]

JUSTICE ALITO, concurring.

I join the plurality opinion but write separately to explain my view of how the holding should be implemented. The opinion concludes that "a State's refusal to change its method [of execution] can be viewed as 'cruel and unusual' under the Eighth Amendment" if the State, "without a legitimate penological justification," rejects an alternative method that is "feasible" and "readily" available and that would "significantly reduce a substantial risk of severe pain." *Ante*, at 13. Properly understood, this standard will not, as JUSTICE THOMAS predicts, lead to litigation that enables "those seeking to abolish the death penalty . . . to embroil the States in never-ending litigation concerning the adequacy of their execution procedures." *Post*, at 12 (opinion concurring in judgment).

## I

As the plurality opinion notes, the constitutionality of capital punishment is not before us in this case, and therefore we proceed on the assumption that the death penalty is constitutional. *Ante*, at 8. From that assumption, it follows that there must be a constitutional means of carrying out a death sentence.

We also proceed in this case on the assumption that lethal injection is a constitutional means of execution. See *Gregg* v. *Georgia*, 428 U. S. 153, 175 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) ("[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity"). Lethal injection was adopted by the Federal Government and 36 States because it was thought to be the most humane method of execution, and petitioners here do not contend that lethal injection should be abandoned in favor of any of the methods that it replaced— execution by electric chair, the gas chamber, hanging, or a firing squad. Since we assume for present purposes that lethal injection is constitutional, the use of that method by the Federal Government and the States must not be blocked by procedural requirements that cannot practicably be satisfied.

Prominent among the practical constraints that must be taken into account in considering the feasibility and availability of any suggested modification of a lethal injection protocol are the ethical restrictions applicable to medical professionals. The first step in the lethal injection protocols currently in use is the anesthetization of the prisoner. If this step is carried out properly, it is agreed, the prisoner will not experience pain during the remainder of the procedure. Every day, general anesthetics are administered to surgical patients in this country, and if the medical professionals who participate in these surgeries also participated in the anesthetization of prisoners facing execution by lethal injection, the risk of pain would be minimized. But the ethics rules of medical professionals— for reasons that I certainly do not question here—prohibit their participation in executions.

Guidelines issued by the American Medical Association (AMA) state that "[a]n individual's opinion on capital punishment is the personal moral decision of the individ-

ual," but that "[a] physician, as a member of a profession dedicated to preserving life when there is hope of doing so, should not be a participant in a legally authorized execution." AMA, Code of Medical Ethics, Policy E–2.06 Capital Punishment (2000), online at http://www.ama-assn.org/ ama1/pub/upload/mm/369/e206capitalpunish.pdf (all Internet materials as visited Apr. 14, 2008, and available in Clerk of Court's case file). The guidelines explain:

> "Physician participation in an execution includes, but is not limited to, the following actions: prescribing or administering tranquilizers and other psychotropic agents and medications that are part of the execution procedure; monitoring vital signs on site or remotely (including monitoring electrocardiograms); attending or observing an execution as a physician; and rendering of technical advice regarding execution." *Ibid.*

The head of ethics at the AMA has reportedly opined that "[e]ven helping to design a more humane protocol would disregard the AMA code." Harris, Will Medics' Qualms Kill the Death Penalty? 441 Nature 8–9 (May 4, 2006).

The American Nurses Association (ANA) takes the position that participation in an execution "is a breach of the ethical traditions of nursing, and the *Code for Nurses*." ANA, Position Statement: Nurses' Participation in Capital Punishment (1994), online at http://nursingworld.org/Main MenuCategories /HealthcareandPolicyIssues /ANAPosition StatementsEthicsandHumanRights.aspx. This means, the ANA explains, that a nurse must not "take part in assessment, supervision or monitoring of the procedure or the prisoner; procuring, prescribing or preparing medications or solutions; inserting the intravenous catheter; injecting the lethal solution; and attending or witnessing the execution as a nurse." *Ibid.*

The National Association of Emergency Medical Techni-

cians (NAEMT) holds that "[p]articipation in capital pun-
ishment is inconsistent with the ethical precepts and goals
of the [Emergency Medical Services] profession." NAEMT,
Position Statement on EMT and Paramedic Participa-
tion in Capital Punishment (June 9, 2006), online at
http://www.naemt.org/aboutNAEMT/capitalpunishment.htm
The NAEMT's Position Statement advises that emergency
medical technicians and paramedics should refrain from
the same activities outlined in the ANA statement. *Ibid.*

   Recent litigation in California has demonstrated the
effect of such ethics rules. Michael Morales, who was
convicted and sentenced to death for a 1981 murder, filed
a federal civil rights action challenging California's lethal
injection protocol, which, like Kentucky's, calls for the
sequential administration of three drugs: sodium pento-
thal, pancuronium bromide, and potassium chloride. The
District Court enjoined the State from proceeding with the
execution unless it either (1) used only sodium pentothal
or another barbiturate or (2) ensured that an anesthesi-
ologist was present to ensure that Morales remained
unconscious throughout the process. *Morales* v. *Hickman*,
415 F. Supp. 2d 1037, 1047 (ND Cal. 2006). The Ninth
Circuit affirmed the District Court's order, *Morales* v.
*Hickman*, 438 F. 3d 926, 931 (2006), and the State ar-
ranged for two anesthesiologists to be present for the
execution. However, they subsequently concluded that
"they could not proceed for reasons of medical ethics,"
*Morales* v. *Tilton*, 465 F. Supp. 2d 972, 976 (ND Cal.
2006), and neither Morales nor any other prisoner in
California has since been executed, see Denno, The Lethal
Injection Quandary: How Medicine Has Dismantled the
Death Penalty, 76 Ford. L. Rev. 49 (2007).

   Objections to features of a lethal injection protocol must
be considered against the backdrop of the ethics rules of
medical professionals and related practical constraints.
Assuming, as previously discussed, that lethal injection is

not unconstitutional *per se*, it follows that a suggested modification of a lethal injection protocol cannot be regarded as "feasible" or "readily" available if the modification would require participation—either in carrying out the execution or in training those who carry out the execution—by persons whose professional ethics rules or traditions impede their participation.

## II

In order to show that a modification of a lethal injection protocol is required by the Eighth Amendment, a prisoner must demonstrate that the modification would *"significantly* reduce a *substantial* risk of *severe* pain." *Ante*, at 13 (emphasis added). Showing merely that a modification would result in some reduction in risk is insufficient. Moreover, an inmate should be required to do more than simply offer the testimony of a few experts or a few studies. Instead, an inmate challenging a method of execution should point to a well-established scientific consensus. Only if a State refused to change its method in the face of such evidence would the State's conduct be comparable to circumstances that the Court has previously held to be in violation of the Eighth Amendment. See *Farmer* v. *Brennan*, 511 U. S. 825, 836 (1994).

The present case well illustrates the need for this type of evidence. Although there has been a proliferation of litigation challenging current lethal injection protocols, evidence regarding alleged defects in these protocols and the supposed advantages of alternatives is strikingly haphazard and unreliable. As THE CHIEF JUSTICE and JUSTICE BREYER both note, the much-discussed Lancet article, Koniaris, Zimmers, Lubarsky, & Sheldon, Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412 (Apr. 2005), that prompted criticism of the three-drug protocol has now been questioned, see Groner, Inadequate Anaesthesia in Lethal Injection for Execution,

366 Lancet 1073 (Sept. 2005). And the lack of clear guidance in the currently available scientific literature is dramatically illustrated by the conclusions reached by petitioners and by JUSTICE STEVENS regarding what they view as superior alternatives to the three-drug protocol.

Petitioners' chief argument is that Kentucky's procedure violates the Eighth Amendment because it does not employ a one-drug protocol involving a lethal dose of an anesthetic. By "relying . . . on a lethal dose of an anesthetic," petitioners contend, Kentucky "would virtually eliminate the risk of pain." Brief for Petitioners 51. Petitioners point to expert testimony in the trial court that "a three-gram dose of thiopental would cause death within three minutes to fifteen minutes." *Id*., at 54, n. 16.

The accuracy of that testimony is not universally accepted. Indeed, the medical authorities in the Netherlands, where assisted suicide is legal, have recommended against the use of a lethal dose of a barbiturate. An *amicus supporting petitioners*, Dr. Robert D. Truog, Professor of Medical Ethics and Anesthesiology at Harvard Medical School, has made the following comments about the use of a lethal dose of a barbiturate:

> "A number of experts have said that 2 or 3 or 5 g[rams] of pentothal is absolutely going to be lethal. The fact is that, at least in this country, none of us have any experience with this. . . .
>
> "If we go to Holland, where euthanasia is legal, and we look at a study from 2000 of 535 cases of euthanasia, in 69% of those cases, they used a paralytic agent. Now, what do they know that we haven't figured out yet? I think what they know is that it's actually very difficult to kill someone with just a big dose of a barbiturate. And, in fact, they report that in 6% of those cases, there were problems with completion. And in I think five of those, the person actually woke up, came

back out of coma." Perspective Roundtable: Physicians and Execution—Highlights from a Discussion of Lethal Injection, 358 New England J. Med. 448 (2008).

JUSTICE STEVENS does not advocate a one-drug protocol but argues that "States wishing to decrease the risk that future litigation will delay executions or invalidate their protocols would do well to reconsider their continued use of pancuronium bromide" in the second step of the three-drug protocol.* *Post*, at 8 (opinion concurring in judgment). But this very drug, pancuronium bromide, is recommended by the Royal Dutch Society for the Advancement of Pharmacy as the second of the two drugs to be used in cases of euthanasia. See Kimsma, Euthanasia and Euthanizing Drugs in The Netherlands, reprinted in Drug Use in Assisted Suicide and Euthanasia 193, 200, 204 (M. Battin & A. Lipman eds. 1996).

My point in citing the Dutch study is not that a multi-drug protocol is in fact better than a one-drug protocol or that it is advisable to use pancuronium bromide. Rather, my point is that public policy on the death penalty, an issue that stirs deep emotions, cannot be dictated by the testimony of an expert or two or by judicial findings of fact based on such testimony.

### III

The seemingly endless proceedings that have character-

---

　*In making this recommendation, he states that "[t]here is a general understanding among veterinarians that the risk of pain is sufficiently serious that the use of [this] drug should be proscribed when an animal's life is being terminated." *Post*, at 1-2. But the American Veterinary Medical Association (AVMA) guidelines take pains to point out that the Association's guidelines should not be interpreted as commenting on the execution of humans by lethal injection. AVMA, Guidelines on Euthanasia (June 2007), online at http://avma.org/issues/animal_welfare/euthanasia.pdf.

ized capital litigation during the years following *Gregg* are
well documented. In 1989, the Report of the Judicial
Conference's Ad Hoc Committee on Federal Habeas Cor-
pus in Capital Cases, chaired by Justice Powell, noted the
lengthy delays produced by collateral litigation in death
penalty cases. See Committee Report and Proposal 2–4.
The Antiterrorism and Effective Death Penalty Act of
1996 (AEDPA) was designed to address this problem. See,
*e.g.*, *Woodford* v. *Garceau*, 538 U. S. 202, 206 (2003)
("Congress enacted AEDPA to reduce delays in the execu-
tion of state and federal criminal sentences, particularly in
capital cases . . ." (citing *Williams* v. *Taylor*, 529 U. S.
362, 386 (2000) (opinion of STEVENS, J.))); H. R. Rep. No.
104–23, p. 8 (1995) (stating that AEDPA was "designed to
curb the abuse of the habeas corpus process, and particu-
larly to address the problem of delay and repetitive litiga-
tion in capital cases").

Misinterpretation of the standard set out in the plural-
ity opinion or adoption of the standard favored by the
dissent and JUSTICE BREYER would create a grave danger
of extended delay. The dissenters and JUSTICE BREYER
would hold that the protocol used in carrying out an exe-
cution by lethal injection violates the Eighth Amendment
if it creates an "*untoward*, readily avoidable risk of inflict-
ing severe and unnecessary pain." See *post*, at 11
(GINSBURG, J., dissenting) (emphasis added); *post*, at 1
(BREYER, J., concurring in judgment). Determining
whether a risk is "untoward," we are told, requires a
weighing of three factors—the severity of the pain that
may occur, the likelihood of this pain, and the availability
of alternative methods. *Post*, at 4 (GINSBURG, J., dissent-
ing). We are further informed that "[t]he three factors are
interrelated; a strong showing on one reduces the impor-
tance of others." *Ibid.*

An "untoward" risk is presumably a risk that is "unfor-
tunate" or "marked by or causing trouble or unhappiness."

ALITO, J., concurring

Webster's Third New International Dictionary 2513 (1971); Random House Dictionary of the English Language 1567 (1967). This vague and malleable standard would open the gates for a flood of litigation that would go a long way toward bringing about the end of the death penalty as a practical matter. While I certainly do not suggest that this is the intent of the Justices who favor this test, the likely consequences are predictable.

The issue presented in this case—the constitutionality of a *method* of execution—should be kept separate from the controversial issue of the death penalty itself. If the Court wishes to reexamine the latter issue, it should do so directly, as JUSTICE STEVENS now suggests. *Post*, at 12. The Court should not produce a *de facto* ban on capital punishment by adopting method-of-execution rules that lead to litigation gridlock.

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–5439

_____

## RALPH BAZE AND THOMAS C. BOWLING, PETI-TIONERS *v.* JOHN D. REES, COMMISSIONER, KENTUCKY DEPARTMENT OF CORRECTIONS, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF KENTUCKY

[April 16, 2008]

JUSTICE STEVENS, concurring in the judgment.

When we granted certiorari in this case, I assumed that our decision would bring the debate about lethal injection as a method of execution to a close. It now seems clear that it will not. The question whether a similar three-drug protocol may be used in other States remains open, and may well be answered differently in a future case on the basis of a more complete record. Instead of ending the controversy, I am now convinced that this case will gener-ate debate not only about the constitutionality of the three-drug protocol, and specifically about the justification for the use of the paralytic agent, pancuronium bromide, but also about the justification for the death penalty itself.

I

Because it masks any outward sign of distress, pan-curonium bromide creates a risk that the inmate will suffer excruciating pain before death occurs. There is a general understanding among veterinarians that the risk of pain is sufficiently serious that the use of the drug should be proscribed when an animal's life is being termi-

nated.[1]  As a result of this understanding among knowl-
edgeable professionals, several States—including Ken-
tucky—have enacted legislation prohibiting use of the
drug in animal euthanasia.  See 2 Ky. Admin. Regs., tit.
201, ch. 16:090, §5(1) (2004).[2]  It is unseemly—to say the

—————

[1] The 2000 Report of the American Veterinary Medical Association
(AVMA) Panel on Euthanasia stated that a "combination of pentobarbi-
tal with a neuromuscular blocking agent is not an acceptable euthana-
sia agent."  218 J. Am. Veterinary Med. Assn. 669, 680 (2001).  In a
2006 supplemental statement, however, the AVMA clarified that this
statement was intended as a recommendation against mixing a barbi-
turate and neuromuscular blocking agent in the same syringe, since
such practice creates the possibility that the paralytic will take effect
before the barbiturate, rendering the animal paralyzed while still
conscious.  The 2007 AVMA Guidelines on Euthanasia plainly state
that the application of a barbiturate, paralyzing agent, and potassium
chloride delivered in separate syringes or stages is not discussed in the
report.  Several veterinarians, however, have filed an *amici* brief in this
case arguing that the three-drug cocktail fails to measure up to veteri-
nary standards and that the use of pancuronium bromide should be
prohibited.  See Brief for Dr. Kevin Concannon et al. as *amici curiae*
16–18.  The Humane Society has also declared "inhumane" the use of
"any combination of sodium pentobarbital with a neuromuscular
blocking agent."  R. Rhoades, The Humane Society of the United States,
Euthanasia Training Manual 133 (2002); see also Alper, Anesthetizing
the Public Conscience: Lethal Injection and Animal Euthanasia, 35
Fordham  Urb.  L. J.  ___,  ___  (forthcoming  2008),  online  at
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1109258 (all Inter-
net materials as visited Apr. 10, 2008, and available in Clerk of Court's
case file) (concluding, based on a comprehensive study of animal
euthanasia laws and regulations that "the field of animal euthanasia
has reached a unanimous consensus . . . that neuromuscular blocking
agents like pancuronium have no legitimate place in the execution
process").

[2] See also, *e.g.*, Fla. Stat. §828.058(3) (2006) ("[A]ny substance which
acts as a neuromuscular blocking agent . . . may not be used on a dog or
cat for any purpose"); N. J. Stat. Ann. §4:22–19.3 (West 1998) ("When-
ever any dog, cat, or any other domestic animal is to be destroyed, the
use of succinylcholine chloride, curare, curariform drugs, or any other
substance which acts as a neuromuscular blocking agent is prohib-
ited"); N. Y. Agric. & Mkts. Law Ann. §374(2–b) (West 2004) ("No

least—that Kentucky may well kill petitioners using a drug that it would not permit to be used on their pets.

Use of pancuronium bromide is particularly disturbing because—as the trial court specifically found in this case—it serves "no therapeutic purpose." App. 763. The drug's primary use is to prevent involuntary muscle movements, and its secondary use is to stop respiration. In my view, neither of these purposes is sufficient to justify the risk inherent in the use of the drug.

The plurality believes that preventing involuntary movement is a legitimate justification for using pancuronium bromide because "[t]he Commonwealth has an interest in preserving the dignity of the procedure, especially where convulsions or seizures could be misperceived as signs of consciousness or distress." *Ante*, at 19. This is a woefully inadequate justification. Whatever minimal interest there may be in ensuring that a condemned inmate dies a dignified death, and that witnesses to the execution are not made uncomfortable by an incorrect belief (which could easily be corrected) that the inmate is in pain, is vastly outweighed by the risk that the inmate is actually experiencing excruciating pain that no one can detect.[3] Nor is there any necessity for pancuronium bro-

_____

person shall euthanize any dog or cat with T–61, curare, any curari- form drug, any neuro-muscular blocking agent or any other paralyzing drug"); Tenn. Code Ann. §44–17–303(c) (2007) ("Succinylcholine chlo- ride, curare, curariform mixtures . . . or any substance that acts as a neuromuscular blocking agent . . . may not be used on any non-livestock animal for the purpose of euthanasia"). According to a recent study, not a single State sanctions the use of a paralytic agent in the admini- stration of animal euthanasia, 9 States explicitly ban the use of such drugs, 13 others ban it by implication—*i.e.,* by mandating the use of nonparalytic drugs, 12 arguably ban it by reference to the AVMA guidelines, and 8 others express a strong preference for use of nonpara- lytic drugs. Anesthetizing the Public Conscience, *supra*, at \_\_\_\_, and App.1.

[3]Indeed, the decision by prison administrators to use the drug on

mide to be included in the cocktail to inhibit respiration when it is immediately followed by potassium chloride, which causes death quickly by stopping the inmate's heart.

Moreover, there is no nationwide endorsement of the use of pancuronium bromide that merits any special presumption of respect. While state legislatures have approved lethal injection as a humane method of execution, the majority have not enacted legislation specifically approving the use of pancuronium bromide, or any given combination of drugs.[4] And when the Colorado Legisla-

_____

humans for aesthetic reasons is not supported by any consensus of medical professionals. To the contrary, the medical community has considered—and rejected—this aesthetic rationale for administering neuromuscular blocking agents in end-of-life care for terminally ill patients whose families may be disturbed by involuntary movements that are misperceived as signs of pain or discomfort. As explained in an *amici curiae* brief submitted by critical care providers and clinical ethicists, the medical and medical ethics communities have rejected this rationale because there is a danger that such drugs will mask signs that the patient is actually in pain. See Brief for Critical Care Providers et al. as *amici curiae*.

[4] Of the 35 state statutes providing for execution by lethal injection, only approximately one-third specifically approve the use of a chemical paralytic agent. See Ark. Code Ann. §5–4–617 (2006); Idaho Code §19–2716 (Lexis 2004); Ill. Comp. Stat., ch. 725, §5/119–5 (West 2006); Md. Crim. Law Code Ann. §2–303 (Lexis Supp. 2007); Miss. Code Ann. §99–19–51 (2007); Mont. Code Ann. §46–19–103 (2007); N. H. Rev. Stat. Ann. §630:5 (2007); N. M. Stat. Ann. §31–14–11 (2000); N. C. Gen. Stat. Ann. §15–187 (Lexis 2007); Okla. Stat., Tit. 22, §1014 (West 2001); Ore. Rev. Stat. §137.473 (2003); Pa. Stat. Ann., Tit. 61, §3004 (Purdon 1999); Wyo. Stat. Ann. §7–13–904 (2007). Twenty of the remaining States do not specify any particular drugs. See Ariz. Rev. Stat. Ann. §13–704 (West 2001); Cal. Penal Code Ann. §3604 (West 2000); Conn. Gen. Stat. §54–100 (2007); Del. Code Ann., Tit. 11, §4209 (2006 Supp.); Fla. Stat. §922.105 (2006); Ga. Code Ann. §17–10–38 (2004); Ind. Code §35–38–6–1 (West 2004); Kan. Stat. Ann. §22–4001 (2006 Cum. Supp.); Ky. Rev. Stat. Ann. §431.220 (West 2006); La. Stat. Ann. §15:569 (West 2005); Mo. Rev. Stat. §546.720 (2007 Cum. Supp.); Nev. Rev. Stat. §176.355 (2007); Ohio Rev. Code Ann. §2949.22 (Lexis 2006); S. C. Code Ann.

ture focused on the issue, it specified a one-drug protocol consisting solely of sodium thiopental. See Colo. Rev. Stat. Ann. §18–1.3–1202 (2007).[5] In the majority of States that use the three-drug protocol, the drugs were selected by unelected Department of Correction officials with no specialized medical knowledge and without the benefit of expert assistance or guidance. As such, their drug selections are not entitled to the kind of deference afforded legislative decisions.

Nor should the failure of other state legislatures, or of Congress, to outlaw the use of the drug on condemned prisoners be viewed as a nationwide endorsement of an unnecessarily dangerous practice. Even in those States where the legislature specifically approved the use of a paralytic agent, review of the decisions that led to the adoption of the three-drug protocol has persuaded me that they are the product of "'administrative convenience'" and a "stereotyped reaction" to an issue, rather than a careful analysis of relevant considerations favoring or disfavoring a conclusion. See *Mathews* v. *Lucas,* 427 U. S. 495, 519, 520–521 (1976) (STEVENS, J., dissenting). Indeed, the trial court found that "the various States simply fell in line" behind Oklahoma, adopting the protocol without any critical analysis of whether it was the best available alter-

––––––––

§24–3–530 (2007); S. D. Codified Laws §23A–27A–32 (Supp. 2007); Tenn. Code Ann. §40–23–114 (2006); Tex. Code Crim. Proc. Ann., Art. 43.14 (Vernon 2006 Supp. Pamphlet); Utah Code Ann. §77–18–5.5 (Lexis Supp. 2007); Va. Code Ann. §53.1–234 (Lexis Supp. 2007); Wash. Rev. Code §10.95.180 (2006).

[5] Colorado's statute provides for "a continuous intravenous injection of a lethal quantity of sodium thiopental or other equally or more effective substance sufficient to cause death." §18–1.3–1202. Despite the fact that the statute specifies only sodium thiopental, it appears that Colorado uses the same three drugs as other States. See Denno, The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty, 76 Ford. L. Rev. 49, 97, and n. 322 (2007).

native.[6]  App. 756; see also *post,* at 5 (GINSBURG, J.,
dissenting).

New Jersey's experience with the creation of a lethal
injection protocol is illustrative.  When New Jersey re-
stored the death penalty in 1983, its legislature "fell in
line" and enacted a statute that called for inmates to be
executed by "continuous, intravenous administration until
the person is dead of a lethal quantity of an ultrashort-
acting barbiturate in combination with a chemical para-
lytic agent in a quantity sufficient to cause death."  N. J.
Stat. Ann. §2C:49–2 (West 2005).  New Jersey Department
of Corrections (DOC) officials, including doctors and ad-
ministrators, immediately expressed concern.  The Capital
Sentencing Unit's chief doctor, for example, warned the
Assistant Commissioner that he had "'concerns . . . in
regard to the chemical substance classes from which the
lethal substances may be selected.'"  Edwards, New Jer-
sey's Long Waltz With Death, 170 N. J. L. J. 657, 673
(2002).[7]  Based on these concerns, the former DOC Com-
missioner lobbied the legislature to amend the lethal
injection statute to provide DOC with discretion to select
more humane drugs: "'[We wanted] a generic statement,
like "drugs to be determined and identified by the commis-

─────────

[6] Notably, the Oklahoma medical examiner who devised the protocol
has disavowed the use of pancuronium bromide.  When asked in a
recent interview why he included it in his formula, he responded: "'It's
a good question.  If I were doing it now, I would probably eliminate it.'"
E. Cohen, Lethal injection creator: Maybe it's time to change
the formula, http://www.cnn.com/2007/HEALTH/04/30/lethal.injection/
index.html.

[7] Officials of the DOC had before them an advisory paper submitted
by a group of New York doctors recommending sodium thiopental
"'without the addition of other drugs,'" and the supervisor of the
Health Services Unit was informed in a memo from a colleague that
pancuronium bromide "'will cause paralysis of the vocal chords and
stop breathing, and hence could cause death by asphyxiation.'"  Ed-
wards, 170 N. J. L. J., at 673.

sioner, or the attorney general, or the Department of Health"'. . . . 'Who knew what the future was going to bring?'" *Ibid.* And these concerns likely motivated the DOC's decision to adopt a protocol that omitted pancuronium bromide—despite the legislature's failure to act on the proposed amendment. See Denno, When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us, 63 Ohio St. L. J. 63, 117–118, 233 (2002) (explaining that the New Jersey protocol in effect in 2002 called for use of a two-drug cocktail consisting of sodium thiopental and potassium chloride).

Indeed, DOC officials seemed to harbor the same concerns when they undertook to revise New Jersey's lethal injection protocol in 2005. At a public hearing on the proposed amendment, the DOC Supervisor of Legal and Legislative Affairs told attendees that the drugs to be used in the lethal injection protocol were undetermined:

> "Those substances have not been determined at this point because when and if an execution is scheduled the [DOC] will be doing research and determining the state-of-the-art drugs at that point in time . . . . We have not made a decision on which specific drugs because we will have several months once we know that somebody is going to be executed and it will give us the opportunity at that point to decide which would be the most humane.
>
> "And things change. We understand that the state-of-the-art is changing daily so to say we are going to use something today when something may be more humane becomes known later wouldn't make sense for us." Tr. of Public Hearing on Proposed Amendments to the New Jersey Lethal Injection Protocol 36 (Feb. 4, 2005).

It is striking that when this state agency—with some

specialized medical knowledge and with the benefit of some expert assistance and guidance—focused on the issue, it disagreed with the legislature's "stereotyped reaction," *Mathews,* 427 U. S., at 520, 521 (STEVENS, J., dissenting), and specified a two-drug protocol that omitted pancuronium bromide.[8]

In my view, therefore, States wishing to decrease the risk that future litigation will delay executions or invalidate their protocols would do well to reconsider their continued use of pancuronium bromide.[9]

## II

The thoughtful opinions written by THE CHIEF JUSTICE and by JUSTICE GINSBURG have persuaded me that current decisions by state legislatures, by the Congress of the United States, and by this Court to retain the death penalty as a part of our law are the product of habit and inattention rather than an acceptable deliberative process that weighs the costs and risks of administering that penalty against its identifiable benefits, and rest in part on a faulty assumption about the retributive force of the death penalty.

──────────

[8] Further, concerns about this issue may have played a role in New Jersey's subsequent decisions to create a New Jersey Death Penalty Study Commission in 2006, and ultimately to abolish the death penalty in 2007.

[9] For similar reasons, States may also be well advised to reconsider the sufficiency of their procedures for checking the inmate's consciousness. See, *post,* at 5–10 (GINSBURG, J., dissenting).

JUSTICE ALITO correctly points out that the Royal Dutch Society for the Advancement of Pharmacy recommends pancuronium bromide "as the second of the two drugs to be used in cases of euthanasia." *Ante*, at 7 (concurring opinion). In the Netherlands, however, physicians with training in anesthesiology are involved in assisted suicide. For reasons JUSTICE ALITO details, see *ante*, at 2–4, physicians have no similar role in American executions. When trained medical personnel administer anesthesia and monitor the individual's anesthetic depth, the serious risks that concern me are not presented.

In *Gregg* v. *Georgia*, 428 U. S. 153 (1976), we explained that unless a criminal sanction serves a legitimate penological function, it constitutes "gratuitous infliction of suffering" in violation of the Eighth Amendment. We then identified three societal purposes for death as a sanction: incapacitation, deterrence, and retribution. See *id.,* at 183, and n. 28 (joint opinion of Stewart, Powell, and STEVENS, JJ.). In the past three decades, however, each of these rationales has been called into question.

While incapacitation may have been a legitimate rationale in 1976, the recent rise in statutes providing for life imprisonment without the possibility of parole demonstrates that incapacitation is neither a necessary nor a sufficient justification for the death penalty.[10] Moreover, a recent poll indicates that support for the death penalty drops significantly when life without the possibility of parole is presented as an alternative option.[11] And the available sociological evidence suggests that juries are less likely to impose the death penalty when life without parole is available as a sentence.[12]

---

[10] Forty-eight States now have some form of life imprisonment without parole, with the majority of statutes enacted within the last two decades. See Note, A Matter of Life and Death: The Effect of Life-Without-Parole Statutes on Capital Punishment, 119 Harv. L. Rev. 1838, 1839, 1841–1844 (2006).

[11] See R. Dieter, Sentencing For Life: Americans Embrace Alternatives to the Death Penalty (Apr. 1993), http://www.deathpenaltyinfo.org/article.php?scid=45&did=481.

[12] In one study, potential capital jurors in Virginia stated that knowing about the existence of statutes providing for life without the possibility of parole would significantly influence their sentencing decision. In another study, a significant majority of potential capital jurors in Georgia said they would be more likely to select a life sentence over a death sentence if they knew that the defendant would be ineligible for parole for at least 25 years. See Note, 119 Harv. L. Rev., at 1845. Indeed, this insight drove our decision in *Simmons* v. *South Carolina*, 512 U. S. 154 (1994), that capital defendants have a due process right to require that their sentencing juries be informed of their ineligibility

The legitimacy of deterrence as an acceptable justifica-
tion for the death penalty is also questionable, at best.
Despite 30 years of empirical research in the area, there
remains no reliable statistical evidence that capital pun-
ishment in fact deters potential offenders.[13]  In the ab-
sence of such evidence, deterrence cannot serve as a suffi-
cient penological justification for this uniquely severe and
irrevocable punishment.

We are left, then, with retribution as the primary ra-
tionale for imposing the death penalty.  And indeed, it is
the retribution rationale that animates much of the re-
maining enthusiasm for the death penalty.[14]  As Lord
Justice Denning argued in 1950, "'some crimes are so
outrageous that society insists on adequate punishment,
because the wrong-doer deserves it, irrespective of
whether it is a deterrent or not.'"  See *Gregg,* 428 U. S., at
184, n. 30.  Our Eighth Amendment jurisprudence has
narrowed the class of offenders eligible for the death pen-

_____

for parole.

[13]Admittedly, there has been a recent surge in scholarship asserting
the deterrent effect of the death penalty, see, *e.g.,* Mocan & Gittings,
Getting Off Death Row: Commuted Sentences and the Deterrent Effect
of Capital Punishment, 46 J. Law & Econ. 453 (2003); Adler & Sum-
mers, Capital Punishment Works, Wall Street Journal, Nov. 2, 2007,
p. A13, but there has been an equal, if not greater, amount of scholar-
ship criticizing the methodologies of those studies and questioning the
results, see, *e.g.,* Fagan, Death and Deterrence Redux: Science, Law
and Causal Reasoning on Capital Punishment, 4 Ohio St. J. Crim. L.
255 (2006); Donohue & Wolfers, Uses and Abuses of Empirical Evidence
in the Death Penalty Debate, 58 Stan. L. Rev. 791 (2005).

[14]Retribution is the most common basis of support for the death pen-
alty.  A recent study found that 37% of death penalty supporters cited
"an eye for an eye/they took a life/fits the crime" as their reason for
supporting capital punishment.  Another 13% cited "They deserve it."
The next most common reasons—"sav[ing] taxpayers money/cost
associated with prison" and deterrence—were each cited by 11% of
supporters.  See Dept. of Justice, Bureau of Justice Statistics, Source-
book of Criminal Justice Statistics 147 (2003) (Table 2.55), online at
http://www.albany.edu/sourcebook/pdf/t255.pdf.

alty to include only those who have committed outrageous crimes defined by specific aggravating factors. It is the cruel treatment of victims that provides the most persuasive arguments for prosecutors seeking the death penalty. A natural response to such heinous crimes is a thirst for vengeance.[15]

At the same time, however, as the thoughtful opinions by THE CHIEF JUSTICE and JUSTICE GINSBURG make pellucidly clear, our society has moved away from public and painful retribution towards ever more humane forms of punishment. State-sanctioned killing is therefore becoming more and more anachronistic. In an attempt to bring executions in line with our evolving standards of decency, we have adopted increasingly less painful methods of execution, and then declared previous methods barbaric and archaic. But by requiring that an execution be relatively painless, we necessarily protect the inmate from enduring any punishment that is comparable to the suffering inflicted on his victim.[16] This trend, while appropriate and required by the Eighth Amendment's prohibition on cruel and unusual punishment, actually under-

_____

[15] For example, family members of victims of the Oklahoma City bombing called for the Government to "'put [Timothy McVeigh] inside a bomb and blow it up.'" Walsh, One Arraigned, Two Undergo Questioning, Washington Post, Apr. 22, 1995, pp. A1, A13. Commentators at the time noted that an overwhelming percentage of Americans felt that executing McVeigh was not enough. Linder, A Political Verdict: McVeigh: When Death Is Not Enough, L. A. Times, June 8, 1997, p. M1.

[16] For example, one survivor of the Oklahoma City bombing expressed a belief that "'death by [lethal] injection [was] "too good" for McVeigh.'" A. Sarat, When the State kills: Capital Punishment and the American Condition 64 (2001). Similarly, one mother, when told that her child's killer would die by lethal injection, asked: "Do they feel anything? Do they hurt? Is there any pain? Very humane compared to what they've done to our children. The torture they've put our kids through. I think sometimes it's too easy. They ought to feel something. If it's fire burning all the way through their body or whatever. There ought to be some little sense of pain to it." *Id.,* at 60 (emphasis deleted).

mines the very premise on which public approval of the retribution rationale is based. See, *e.g.,* Kaufman-Osborn, Regulating Death: Capital Punishment and the Late Liberal State, 111 Yale L. J. 681, 704 (2001) (explaining that there is "a tension between our desire to realize the claims of retribution by killing those who kill, and . . . a method [of execution] that, because it seems to do no harm other than killing, cannot satisfy the intuitive sense of equivalence that informs this conception of justice"); A. Sarat, When the State Kills: Capital Punishment and the American Condition 60–84 (2001).

Full recognition of the diminishing force of the principal rationales for retaining the death penalty should lead this Court and legislatures to reexamine the question recently posed by Professor Salinas, a former Texas prosecutor and judge: "Is it time to Kill the Death Penalty?" See Salinas, 34 Am. J. Crim. L. 39 (2006). The time for a dispassionate, impartial comparison of the enormous costs that death penalty litigation imposes on society with the benefits that it produces has surely arrived.[17]

————————

[17] For a discussion of the financial costs as well as some of the less tangible costs of the death penalty, see Kozinski & Gallagher, Death: The Ultimate Run-On Sentence, 46 Case W. Res. L. Rev. 1 (1995) (discussing, *inter alia*, the burden on the courts and the lack of finality for victim's families). Although a lack of finality in death cases may seem counterintuitive, Kozinski and Gallagher explain:

"Death cases raise many more issues, and far more complex issues, than other criminal cases, and they are attacked with more gusto and reviewed with more vigor in the courts. This means there is a strong possibility that the conviction or sentence will be reconsidered— seriously reconsidered—five, ten, twenty years after the trial. . . . One has to wonder and worry about the effect this has on the families of the victims, who have to live with the possibility—and often the reality—of retrials, evidentiary hearings, and last-minute stays of execution for decades after the crime." *Id.,* at 17–18 (footnotes omitted).

Thus, they conclude that "we are left in limbo, with machinery that is immensely expensive, that chokes our legal institutions so they are impeded from doing all the other things a society expects from its

## III

"[A] penalty may be cruel and unusual because it is excessive and serves no valid legislative purpose." *Furman* v. *Georgia*, 408 U. S. 238, 331 (1972) (Marshall, J., concurring); see also *id.,* at 332 ("The entire thrust of the Eighth Amendment is, in short, against 'that which is excessive'"). Our cases holding that certain sanctions are "excessive," and therefore prohibited by the Eighth Amendment, have relied heavily on "objective criteria," such as legislative enactments. See, *e.g., Solem* v. *Helm,* 463 U. S. 277, 292 (1983); *Harmelin* v. *Michigan*, 501 U. S. 957 (1991); *United States* v. *Bajakajian*, 524 U. S. 321 (1998). In our recent decision in *Atkins* v. *Virginia,* 536 U. S. 304 (2002), holding that death is an excessive sanction for a mentally retarded defendant, we also relied heavily on opinions written by Justice White holding that the death penalty is an excessive punishment for the crime of raping a 16-year-old woman, *Coker* v. *Georgia,*

––––––––––

courts, [and] that visits repeated trauma on victims' families . . . ." *Id.,* at 27–28; see also Block, A Slow Death, N. Y. Times, Mar. 15, 2007, p. A27 (discussing the "enormous costs and burdens to the judicial system" resulting from the death penalty).

Some argue that these costs are the consequence of judicial insistence on unnecessarily elaborate and lengthy appellate procedures. To the contrary, they result "in large part from the States' failure to apply constitutionally sufficient procedures at the time of initial [conviction or] sentencing." *Knight* v. *Florida*, 528 U. S. 990, 998 (1999) (BREYER, J., dissenting from denial of certiorari). They may also result from a general reluctance by States to put large numbers of defendants to death, even after a sentence of death is imposed. Cf. Tempest, Death Row Often Means a Long Life; California condemns many murderers, but few are ever executed, L. A. Times, Mar. 6, 2006, p. B1 (noting that California death row inmates account for about 20% of the Nation's total death row population, but that the State accounts for only 1% of the Nation's executions). In any event, they are most certainly not the fault of judges who do nothing more than ensure compliance with constitutional guarantees prior to imposing the irrevocable punishment of death.

433 U. S. 584 (1977), and for a murderer who did not intend to kill, *Enmund* v. *Florida,* 458 U. S. 782 (1982). In those opinions we acknowledged that "objective evidence, though of great importance, did not 'wholly determine' the controversy, 'for the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.'" *Atkins,* 536 U. S., at 312 (quoting *Coker*, 433 U. S., at 597 (plurality opinion)).

Justice White was exercising his own judgment in 1972 when he provided the decisive vote in *Furman,* the case that led to a nationwide reexamination of the death penalty. His conclusion that death amounted to "cruel and unusual punishment in the constitutional sense" as well as the "dictionary sense," rested on both an uncontroversial legal premise and on a factual premise that he admittedly could not "prove" on the basis of objective criteria. 408 U. S., at 312, 313 (concurring opinion). As a matter of law, he correctly stated that the "needless extinction of life with only marginal contributions to any discernible social or public purposes . . . would be patently excessive" and violative of the Eighth Amendment. *Id.,* at 312. As a matter of fact, he stated, "like my Brethren, I must arrive at judgment; and I can do no more than state a conclusion based on 10 years of almost daily exposure to the facts and circumstances of hundreds and hundreds of federal and state criminal cases involving crimes for which death is the authorized penalty." *Id.,* at 313. I agree with Justice White that there are occasions when a Member of this Court has a duty to make judgments on the basis of data that falls short of absolute proof.

Our decisions in 1976 upholding the constitutionality of the death penalty relied heavily on our belief that adequate procedures were in place that would avoid the danger of discriminatory application identified by Justice Douglas' opinion in *Furman, id.,* at 240–257 (concurring

opinion), of arbitrary application identified by Justice Stewart, *id.,* at 306 (same), and of excessiveness identified by Justices Brennan and Marshall. In subsequent years a number of our decisions relied on the premise that "death is different" from every other form of punishment to justify rules minimizing the risk of error in capital cases. See, *e.g., Gardner* v. *Florida,* 430 U. S. 349, 357–358 (1977) (plurality opinion). Ironically, however, more recent cases have endorsed procedures that provide less protections to capital defendants than to ordinary offenders.

Of special concern to me are rules that deprive the defendant of a trial by jurors representing a fair cross section of the community. Litigation involving both challenges for cause and peremptory challenges has persuaded me that the process of obtaining a "death qualified jury" is really a procedure that has the purpose and effect of obtaining a jury that is biased in favor of conviction. The prosecutorial concern that death verdicts would rarely be returned by 12 randomly selected jurors should be viewed as objective evidence supporting the conclusion that the penalty is excessive.[18]

Another serious concern is that the risk of error in capital cases may be greater than in other cases because the facts are often so disturbing that the interest in making sure the crime does not go unpunished may overcome residual doubt concerning the identity of the offender. Our former emphasis on the importance of ensuring that decisions in death cases be adequately supported by reason rather than emotion, *Gardner,* 430 U. S. 349, has been undercut by more recent decisions placing a thumb on the

––––––––––

[18] See *Uttecht* v. *Brown*, 551 U. S. 1, \_\_\_ (2007) (slip op., at 1) (STEVENS, J., dissenting) (explaining that "[m]illions of Americans oppose the death penalty," and that "[a] cross section of virtually every community in the country includes citizens who firmly believe the death penalty is unjust but who nevertheless are qualified to serve as jurors in capital cases").

prosecutor's side of the scales. Thus, in *Kansas* v. *Marsh*, 548 U. S. 163 (2006), the Court upheld a state statute that requires imposition of the death penalty when the jury finds that the aggravating and mitigating factors are in equipoise. And in *Payne* v. *Tennessee*, 501 U. S. 808 (1991), the Court overruled earlier cases and held that "victim impact" evidence relating to the personal characteristics of the victim and the emotional impact of the crime on the victim's family is admissible despite the fact that it sheds no light on the question of guilt or innocence or on the moral culpability of the defendant, and thus serves no purpose other than to encourage jurors to make life or death decisions on the basis of emotion rather than reason.

A third significant concern is the risk of discriminatory application of the death penalty. While that risk has been dramatically reduced, the Court has allowed it to continue to play an unacceptable role in capital cases. Thus, in *McCleskey* v. *Kemp*, 481 U. S. 279 (1987), the Court upheld a death sentence despite the "strong probability that [the defendant's] sentencing jury . . . was influenced by the fact that [he was] black and his victim was white." *Id.,* at 366 (STEVENS, J., dissenting); see also *Evans* v. *State,* 396 Md. 256, 323, 914 A. 2d 25, 64 (2006), cert. denied, 552 U. S. ___ (2007) (affirming a death sentence despite the existence of a study showing that "the death penalty is *statistically* more likely to be pursued against a black person who murders a white victim than against a defendant in any other racial combination").

Finally, given the real risk of error in this class of cases, the irrevocable nature of the consequences is of decisive importance to me. Whether or not any innocent defendants have actually been executed, abundant evidence accumulated in recent years has resulted in the exoneration of an unacceptable number of defendants found guilty of capital offenses. See Garrett, Judging Innocence, 108

Colum. L. Rev. 55 (2008); Risinger, Innocents Convicted: An Empirically Justified Factual Wrongful Conviction Rate, 97 J. Crim. L. & C. 761 (2007). The risk of executing innocent defendants can be entirely eliminated by treating any penalty more severe than life imprisonment without the possibility of parole as constitutionally excessive.

In sum, just as Justice White ultimately based his conclusion in *Furman* on his extensive exposure to countless cases for which death is the authorized penalty, I have relied on my own experience in reaching the conclusion that the imposition of the death penalty represents "the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State [is] patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Furman*, 408 U. S., at 312 (White, J., concurring). [19]

## IV

The conclusion that I have reached with regard to the constitutionality of the death penalty itself makes my

---

[19] Not a single Justice in *Furman* concluded that the mention of deprivation of "life" in the Fifth and Fourteenth Amendments insulated the death penalty from constitutional challenge. The five Justices who concurred in the judgment necessarily rejected this argument, and even the four dissenters, who explicitly acknowledged that the death penalty was not considered impermissibly cruel at the time of the framing, proceeded to evaluate whether anything had changed in the intervening 181 years that nevertheless rendered capital punishment unconstitutional. *Furman*, 408 U. S., at 380–384 (Burger, C.J., joined by Blackmun, Powell, and Rehnquist, JJ., dissenting); see also *id.,* at 420 ("Nor are 'cruel and unusual punishments' and 'due process of law' static concepts whose meaning and scope were sealed at the time of their writing") (Powell, J., joined by Burger, C.J., and Blackmun and Rehnquist, JJ., dissenting). And indeed, the guarantees of procedural fairness contained in the Fifth and Fourteenth Amendments do not resolve the substantive questions relating to the separate limitations imposed by the Eighth Amendment.

decision in this case particularly difficult. It does not, however, justify a refusal to respect precedents that remain a part of our law. This Court has held that the death penalty is constitutional, and has established a framework for evaluating the constitutionality of particular methods of execution. Under those precedents, whether as interpreted by THE CHIEF JUSTICE or JUSTICE GINSBURG, I am persuaded that the evidence adduced by petitioners fails to prove that Kentucky's lethal injection protocol violates the Eighth Amendment. Accordingly, I join the Court's judgment.

# SUPREME COURT OF THE UNITED STATES

———

No. 07–5439

———

## RALPH BAZE AND THOMAS C. BOWLING, PETI- TIONERS *v.* JOHN D. REES, COMMISSIONER, KENTUCKY DEPARTMENT OF CORRECTIONS, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KENTUCKY

[April 16, 2008]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, con- curring in the judgment.

I join the opinion of JUSTICE THOMAS concurring in the judgment. I write separately to provide what I think is needed response to JUSTICE STEVENS' separate opinion.

I

JUSTICE STEVENS concludes as follows: "[T]he imposi- tion of the death penalty represents the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State [is] patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Ante*, at 17 (opinion concurring in judgment) (internal quotation marks omitted; second bracket in original).

This conclusion is insupportable as an interpretation of the Constitution, which generally leaves it to democrati- cally elected legislatures rather than courts to decide what makes significant contribution to social or public purposes. Besides that more general proposition, the very text of the document recognizes that the death penalty is a permissi- ble legislative choice. The Fifth Amendment expressly

requires a presentment or indictment of a grand jury to hold a person to answer for "a capital, or otherwise infamous crime," and prohibits deprivation of "life" without due process of law. U. S. Const., Amdt. 5. The same Congress that proposed the Eighth Amendment also enacted the Act of April 30, 1790, which made several offenses punishable by death. 1 Stat. 112 (1st Cong., 2d Sess. 1790); see also *Gregg* v. *Georgia*, 428 U. S. 153, 176–178 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). Writing in 1976, Professor Hugo Bedau—no friend of the death penalty himself—observed that "[u]ntil fifteen years ago, save for a few mavericks, no one gave any credence to the possibility of ending the death penalty by judicial interpretation of constitutional law." The Courts, the Constitution, and Capital Punishment 118 (1977). There is simply no legal authority for the proposition that the imposition of death as a criminal penalty is unconstitutional other than the opinions in *Furman* v. *Georgia*, 408 U. S. 238 (1972), which established a nationwide moratorium on capital punishment that JUSTICE STEVENS had a hand in ending four years later in *Gregg*.

II

What prompts JUSTICE STEVENS to repudiate his prior view and to adopt the astounding position that a criminal sanction expressly mentioned in the Constitution violates the Constitution? His analysis begins with what he believes to be the "uncontroversial legal premise" that the "'extinction of life with only marginal contributions to any discernible social or public purposes . . . would be patently excessive' and violative of the Eighth Amendment." *Ante*, at 14 (quoting in part *Furman*, *supra*, at 312 (White, J., concurring)); see also *ante*, at 9 (citing *Gregg*, *supra*, at 183, and n. 28). Even if that were uncontroversial in the abstract (and it is certainly not what occurs to me as the meaning of "cruel and unusual punishments"), it is assur-

edly controversial (indeed, flat-out wrong) as applied to a mode of punishment that is explicitly sanctioned by the Constitution. As to that, *the people* have determined whether there is adequate contribution to social or public purposes, and it is no business of unelected judges to set that judgment aside. But even if we grant JUSTICE STEVENS his "uncontroversial premise," his application of that premise to the current practice of capital punishment does not meet the "heavy burden [that] rests on those who would attack the judgment of the representatives of the people." *Gregg, supra*, at 175 (joint opinion of Stewart, Powell, and STEVENS, JJ.). That is to say, JUSTICE STEVENS' policy analysis of the constitutionality of capital punishment fails on its own terms.

According to JUSTICE STEVENS, the death penalty promotes none of the purposes of criminal punishment because it neither prevents more crimes than alternative measures nor serves a retributive purpose. *Ante*, at 9. He argues that "the recent rise in statutes providing for life imprisonment without the possibility of parole" means that States have a ready alternative to the death penalty. *Ibid.* Moreover, "[d]espite 30 years of empirical research in the area, there remains no reliable statistical evidence that capital punishment in fact deters potential offenders." *Ante*, at 10. Taking the points together, JUSTICE STEVENS concludes that the availability of alternatives, and what he describes as the unavailability of "reliable statistical evidence," renders capital punishment unconstitutional. In his view, the benefits of capital punishment—as compared to other forms of punishment such as life imprisonment—are outweighed by the costs.

These conclusions are not supported by the available data. JUSTICE STEVENS' analysis barely acknowledges the "significant body of recent evidence that capital punishment may well have a deterrent effect, possibly a quite powerful one." Sunstein & Vermeule, Is Capital Punish-

ment Morally Required? Acts, Omissions, and Life-Life Tradeoffs, 58 Stan. L. Rev. 703, 706 (2006); see also *id.*, at 706, n. 9 (listing the approximately half a dozen studies supporting this conclusion). According to a "leading national study," "each execution prevents some eighteen murders, on average." *Id.*, at 706. "If the current evidence is even roughly correct . . . then a refusal to impose capital punishment will effectively condemn numerous innocent people to death." *Ibid.*

Of course, it may well be that the empirical studies establishing that the death penalty has a powerful deterrent effect are incorrect, and some scholars have disputed its deterrent value. See *ante*, at 10, n. 13. But that is not the point. It is simply not our place to choose one set of responsible empirical studies over another in interpreting the Constitution. Nor is it our place to demand that state legislatures support their criminal sanctions with foolproof empirical studies, rather than commonsense predictions about human behavior. "The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts." *Gregg, supra*, at 186 (joint opinion of Stewart, Powell, and STEVENS, JJ.). Were JUSTICE STEVENS' current view the constitutional test, even his own preferred criminal sanction—life imprisonment without the possibility of parole—may fail constitutional scrutiny, because it is entirely unclear that enough empirical evidence supports that sanction as compared to alternatives such as life with the possibility of parole.

But even if JUSTICE STEVENS' assertion about the deterrent value of the death penalty were correct, the death penalty would yet be constitutional (as he concedes) if it served the appropriate purpose of retribution. I would

think it difficult indeed to prove that a criminal sanction fails to serve a retributive purpose—a judgment that strikes me as inherently subjective and insusceptible of judicial review. JUSTICE STEVENS, however, concludes that, because the Eighth Amendment "protect[s] the inmate from enduring any punishment that is comparable to the suffering inflicted on his victim," capital punishment serves no retributive purpose at all. *Ante*, at 11. The infliction of any pain, according to JUSTICE STEVENS, violates the Eighth Amendment's prohibition against cruel and unusual punishments, but so too does the imposition of capital punishment *without pain* because a criminal penalty lacks a retributive purpose unless it inflicts pain commensurate with the pain that the criminal has caused. In other words, if a punishment is not retributive enough, it is not retributive at all. To state this proposition is to refute it, as JUSTICE STEVENS once understood. "[T]he decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." *Gregg*, 428 U. S., at 184 (joint opinion of Stewart, Powell, and STEVENS, JJ.).

JUSTICE STEVENS' final refuge in his cost-benefit analysis is a familiar one: There is a risk that an innocent person might be convicted and sentenced to death—though not a risk that JUSTICE STEVENS can quantify, because he lacks a single example of a person executed for a crime he did not commit in the current American system. See *ante*, at 15–17. His analysis of this risk is thus a series of sweeping condemnations that, if taken seriously, would prevent any punishment under any criminal justice system. According to him, "[t]he prosecutorial concern that death verdicts would rarely be returned by 12 randomly selected jurors should be viewed as objective evidence supporting the conclusion that the penalty is excessive."

*Ante*, at 15.  But prosecutors undoubtedly have a similar concern that *any* unanimous conviction would rarely be returned by 12 randomly selected jurors.  That is why they, like defense counsel, are permitted to use the challenges for cause and peremptory challenges that JUSTICE STEVENS finds so troubling, in order to arrive at a jury that both sides believe will be more likely to do justice in a particular case.  JUSTICE STEVENS' concern that prosecutors will be inclined to challenge jurors who will not find a person guilty supports not his conclusion, but the separate (and equally erroneous) conclusion that peremptory challenges and challenges for cause are unconstitutional. According to JUSTICE STEVENS, "the risk of error in capital cases may be greater than in other cases because the facts are often so disturbing that the interest in making sure the crime does not go unpunished may overcome residual doubt concerning the identity of the offender." *Ibid.*  That rationale, however, supports not JUSTICE STEVENS' conclusion that the death penalty is unconstitutional, but the more sweeping proposition that any conviction in a case in which facts are disturbing is suspect—including, of course, convictions resulting in life without parole in those States that do not have capital punishment.  The same is true of JUSTICE STEVENS' claim that there is a risk of "discriminatory application of the death penalty." *Ante*, at 16.  The same could be said of any criminal penalty, including life without parole; there is no proof that in this regard the death penalty is distinctive.

But of all JUSTICE STEVENS' criticisms of the death penalty, the hardest to take is his bemoaning of "the enormous costs that death penalty litigation imposes on society," including the "burden on the courts and the lack of finality for victim's families." *Ante*, at 12, and n. 17. Those costs, those burdens, and that lack of finality are in large measure the creation of JUSTICE STEVENS and other Justices opposed to the death penalty, who have "encum-

ber[ed] [it] . . . with unwarranted restrictions neither contained in the text of the Constitution nor reflected in two centuries of practice under it"—the product of their policy views "not shared by the vast majority of the American people." *Kansas* v. *Marsh*, 548 U. S. 163, 186 (2006) (SCALIA, J., concurring).

## III

But actually none of this really matters. As JUSTICE STEVENS explains, "'objective evidence, though of great importance, [does] not wholly determine the controversy, for the Constitution contemplates that in the end *our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.*'" *Ante*, at 14 (quoting *Atkins* v. *Virginia*, 536 U. S. 304, 312 (2002); emphasis added; some internal quotation marks omitted). "I have relied *on my own experience* in reaching the conclusion that the imposition of the death penalty" is unconstitutional. *Ante*, at 17 (emphasis added).

Purer expression cannot be found of the principle of rule by judicial fiat. In the face of JUSTICE STEVENS' experience, the experience of all others is, it appears, of little consequence. The experience of the state legislatures and the Congress—who retain the death penalty as a form of punishment—is dismissed as "the product of habit and inattention rather than an acceptable deliberative process." *Ante*, at 8. The experience of social scientists whose studies indicate that the death penalty deters crime is relegated to a footnote. *Ante*, at 10, n. 13. The experience of fellow citizens who support the death penalty is described, with only the most thinly veiled condemnation, as stemming from a "thirst for vengeance." *Ante*, at 11. It is JUSTICE STEVENS' experience that reigns over all.

\*    \*    \*

I take no position on the desirability of the death pen-
alty, except to say that its value is eminently debatable
and the subject of deeply, indeed passionately, held
views—which means, to me, that it is preeminently not a
matter to be resolved here. And especially not when it is
explicitly permitted by the Constitution.

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–5439

_____

## RALPH BAZE AND THOMAS C. BOWLING, PETITIONERS *v.* JOHN D. REES, COMMISSIONER, KENTUCKY DEPARTMENT OF CORRECTIONS, ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KENTUCKY

[April 16, 2008]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in the judgment.

Although I agree that petitioners have failed to establish that Kentucky's lethal injection protocol violates the Eighth Amendment, I write separately because I cannot subscribe to the plurality opinion's formulation of the governing standard. As I understand it, that opinion would hold that a method of execution violates the Eighth Amendment if it poses a substantial risk of severe pain that could be significantly reduced by adopting readily available alternative procedures. *Ante*, at 13. This standard—along with petitioners' proposed "unnecessary risk" standard and the dissent's "untoward risk" standard, *post*, at 2—finds no support in the original understanding of the Cruel and Unusual Punishments Clause or in our previous method-of-execution cases; casts constitutional doubt on long-accepted methods of execution; and injects the Court into matters it has no institutional capacity to resolve. Because, in my view, a method of execution violates the Eighth Amendment only if it is deliberately designed to inflict pain, I concur only in the judgment.

## I

The Eighth Amendment's prohibition on the "in-flict[ion]" of "cruel and unusual punishments" must be understood in light of the historical practices that led the Framers to include it in the Bill of Rights. JUSTICE STEVENS' ruminations notwithstanding, see *ante*, at 8–18 (opinion concurring in judgment), it is clear that the Eighth Amendment does not prohibit the death penalty. That is evident both from the ubiquity of the death penalty in the founding era, see S. Banner, The Death Penalty: An American History 23 (2002) (hereinafter Banner) (noting that, in the late 18th century, the death penalty was "the standard penalty for all serious crimes"), and from the Constitution's express provision for capital punishment, see, *e.g.*, Amdt. 5 (requiring an indictment or presentment of a grand jury to hold a person for "a capital, or otherwise infamous crime," and prohibiting deprivation of "life" without due process of law).

That the Constitution permits capital punishment in principle does not, of course, mean that all methods of execution are constitutional. In English and early colonial practice, the death penalty was not a uniform punishment, but rather a range of punishments, some of which the Framers likely regarded as cruel and unusual. Death by hanging was the most common mode of execution both before and after 1791, and there is no doubt that it remained a permissible punishment after enactment of the Eighth Amendment. "An ordinary death by hanging was not, however, the harshest penalty at the disposal of the seventeenth- and eighteenth-century state." Banner 70. In addition to hanging, which was intended to, and often did, result in a quick and painless death, "[o]fficials also wielded a set of tools capable of *intensifying* a death sentence," that is, "ways of producing a punishment worse than death." *Id.*, at 54.

One such "tool" was burning at the stake. Because

burning, unlike hanging, was always painful and de-stroyed the body, it was considered "a form of super-capital punishment, worse than death itself." *Id.,* at 71. Reserved for offenders whose crimes were thought to pose an especially grave threat to the social order—such as slaves who killed their masters and women who killed their husbands—burning a person alive was so dreadful a punishment that sheriffs sometimes hanged the offender first "as an act of charity." *Id.*, at 72.

Other methods of intensifying a death sentence included "gibbeting," or hanging the condemned in an iron cage so that his body would decompose in public view, see *id.*, at 72–74, and "public dissection," a punishment Blackstone associated with murder, 4 W. Blackstone, Commentaries 376 (1769) (hereinafter Blackstone). But none of these was the worst fate a criminal could meet. That was re-served for the most dangerous and reprobate offenders—traitors. "The punishment of high treason," Blackstone wrote, was "very solemn and terrible," *id.*, at 92, and involved "embowelling alive, beheading, and quartering," *id.*, at 376. Thus, the following death sentence could be pronounced on seven men convicted of high treason in England:

> "'That you and each of you, be taken to the place from whence you came, and from thence be drawn on a hurdle to the place of execution, where you shall be hanged by the necks, not till you are dead; that you be severally taken down, while yet alive, and your bowels be taken out and burnt before your faces—that your heads be then cut off, and your bodies cut in four quarters, to be at the King's disposal. And God Al-mighty have mercy on your souls.'" G. Scott, History of Capital Punishment 179 (1950).*

——————

\*As gruesome as these methods of execution were, they were not the

The principal object of these aggravated forms of capital punishment was to terrorize the criminal, and thereby more effectively deter the crime. Their defining characteristic was that they were purposely designed to inflict pain and suffering beyond that necessary to cause death. As Blackstone put it, "in very atrocious crimes, other circumstances of terror, pain, or disgrace [were] superadded." 4 Blackstone 376. These "superadded" circumstances "were carefully handed out to apply terror where it was thought to be most needed," and were designed "to ensure that death would be slow and painful, and thus all the more frightening to contemplate." Banner 70.

Although the Eighth Amendment was not the subject of extensive discussion during the debates on the Bill of Rights, there is good reason to believe that the Framers viewed such enhancements to the death penalty as falling within the prohibition of the Cruel and Unusual Punishments Clause. By the late 18th century, the more violent modes of execution had "dwindled away," *id.,* at 76, and would for that reason have been "unusual" in the sense that they were no longer "regularly or customarily employed," *Harmelin* v. *Michigan*, 501 U. S. 957, 976 (1991) (opinion of SCALIA, J.); see also *Weems* v. *United States*, 217 U. S. 349, 395 (1910) (White, J., dissenting) (noting that, "prior to the formation of the Constitution, the necessity for the protection afforded by the cruel and unusual

———————

worst punishments the Framers would have been acquainted with. After surveying the various "superadd[itions]" to the death penalty in English law, as well as lesser punishments such as "mutilation or dismembering, by cutting off the hand or ears" and stigmatizing the offender "by slitting the nostrils, or branding in the hand or cheek," Blackstone was able to congratulate his countrymen on their refinement, in contrast to the barbarism on the Continent: "Disgusting as this catalogue may seem, it will afford pleasure to an English reader, and do honor to the English law, to compare it with that shocking apparatus of death and torment to be met with in the criminal codes of almost every other nation in Europe." 4 Blackstone 377.

punishment guarantee of the English bill of rights had ceased to be a matter of concern, because as a rule the cruel bodily punishments of former times were no longer imposed"). Embellishments upon the death penalty designed to inflict pain for pain's sake also would have fallen comfortably within the ordinary meaning of the word "cruel." See 1 S. Johnson, A Dictionary of the English Language 459 (1773) (defining "cruel" to mean "[p]leased with hurting others; inhuman; hard-hearted; void of pity; wanting compassion; savage; barbarous; unrelenting"); 1 N. Webster, An American Dictionary of the English Language 52 (1828) (defining "cruel" as "[d]isposed to give pain to others, in body or mind; willing or pleased to torment, vex or afflict; inhuman; destitute of pity, compassion or kindness").

Moreover, the evidence we do have from the debates on the Constitution confirms that the Eighth Amendment was intended to disable Congress from imposing torturous punishments. It was the absence of such a restriction on Congress' power in the Constitution as drafted in Philadelphia in 1787 that led one delegate at the Massachusetts ratifying convention to complain that Congress was "nowhere restrained from inventing the most cruel and unheard-of punishments, and annexing them to crimes; and there is no constitutional check on them, but that *racks* and *gibbets* may be amongst the most mild instruments of their discipline." 2 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 111 (2d ed. 1891). Similarly, during the ratification debate in Virginia, Patrick Henry objected to the lack of a Bill of Rights, in part because there was nothing to prevent Congress from inflicting "tortures, or cruel and barbarous punishment[s]." 3 *id.,* at 447–448.

Early commentators on the Constitution likewise interpreted the Cruel and Unusual Punishments Clause as referring to torturous punishments. One commentator

viewed the Eighth Amendment as prohibiting "horrid modes of torture":

> "The prohibition of cruel and unusual punishments, marks the improved spirit of the age, which would not tolerate the use of the rack or the stake, or any of those horrid modes of torture, devised by human ingenuity for the gratification of fiendish passion." J. Bayard, A Brief Exposition of the Constitution of the United States 154 (2d ed. 1840).

Similarly, another commentator found "sufficient reasons" for the Eighth Amendment in the "barbarous and cruel punishments" inflicted in less enlightened countries:

> "Under the [Eighth] amendment the infliction of cruel and unusual punishments, is also prohibited. The various barbarous and cruel punishments inflicted under the laws of some other countries, and which profess not to be behind the most enlightened nations on earth in civilization and refinement, furnish sufficient reasons for this express prohibition. Breaking on the wheel, flaying alive, rending asunder with horses, various species of horrible tortures inflicted in the inquisition, maiming, mutilating and scourging to death, are wholly alien to the spirit of our humane general constitution." B. Oliver, The Rights of An American Citizen 186 (1832) (reprint 1970).

So barbaric were the punishments prohibited by the Eighth Amendment that Joseph Story thought the provision "wholly unnecessary in a free government, since it is scarcely possible, that any department of such a government should authorize, or justify such atrocious conduct." 3 J. Story, Commentaries on the Constitution of the United States 750 (1833).

## II

Consistent with the original understanding of the Cruel

and Unusual Punishments Clause, this Court's cases have repeatedly taken the view that the Framers intended to prohibit torturous modes of punishment akin to those that formed the historical backdrop of the Eighth Amendment. See, *e.g.*, *Estelle* v. *Gamble*, 429 U. S. 97, 102 (1976) ("[T]he primary concern of the drafters was to proscribe 'torture[s]' and other 'barbar[ous]' methods of punishment"); *Weems*, 217 U. S., at 390 (White, J., dissenting) ("[I]t may not be doubted, and indeed is not questioned by any one, that the cruel punishments against which the bill of rights provided were the atrocious, sanguinary and inhuman punishments which had been inflicted in the past upon the persons of criminals"). That view has permeated our method-of-execution cases. Thrice the Court has considered a challenge to a modern method of execution, and thrice it has rejected the challenge, each time emphasizing that the Eighth Amendment is aimed at methods of execution purposely designed to inflict pain.

In the first case, *Wilkerson* v. *Utah*, 99 U. S. 130 (1879), the Court rejected the contention that death by firing squad was cruel and unusual. In so doing, it reviewed the various modes of execution catalogued by Blackstone, repeating his observation that "in very atrocious crimes other circumstances of terror, pain, or disgrace were sometimes superadded." *Id.*, at 135. The Court found it "safe to affirm that punishments of torture, such as those mentioned by [Blackstone], and all others in the same line of unnecessary cruelty, are forbidden by [the Eighth Amendment]." *Id.*, at 136. The unanimous Court had no difficulty concluding that death by firing squad did not "fal[l] within that category." *Ibid.*

Similarly, when the Court in *In re Kemmler*, 136 U. S. 436, 446 (1890), unanimously rejected a challenge to electrocution, it interpreted the Eighth Amendment to prohibit punishments that "were manifestly cruel and unusual, as burning at the stake, crucifixion, breaking on

the wheel, or the like":

> "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution.  It implies there something inhuman and barbarous, something more than the mere extinguishment of life."  *Id.*, at 447.

Finally, in *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459 (1947), the Court rejected the petitioner's contention that the Eighth Amendment prohibited Louisiana from subjecting him to a second attempt at electrocution, the first attempt having failed when "[t]he executioner threw the switch but, presumably because of some mechanical difficulty, death did not result."  *Id.*, at 460 (plurality opinion).  Characterizing the abortive attempt as "an accident, with no suggestion of malevolence," *id.*, at 463, the plurality opinion concluded that "the fact that petitioner ha[d] already been subjected to a current of electricity [did] not make his subsequent execution any more cruel in the constitutional sense than any other execution":

> "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution.  There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution."  *Id.*, at 464.

## III

In light of this consistent understanding of the Cruel and Unusual Punishments Clause as forbidding purposely

torturous punishments, it is not surprising that even an ardent abolitionist was constrained to acknowledge in 1977 that "[a]n unbroken line of interpreters has held that it was the original understanding and intent of the framers of the Eighth Amendment . . . to proscribe as 'cruel and unusual' *only* such modes of execution as compound the simple infliction of death with added cruelties or indignities." H. Bedau, The Courts, the Constitution, and Capital Punishment 35. What is surprising is the plurality's willingness to discard this unbroken line of authority in favor of a standard that finds no support in the original understanding of the Eighth Amendment or in our method-of-execution cases and that, disclaimers notwithstanding, "threaten[s] to transform courts into boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology." *Ante*, at 12.

We have never suggested that a method of execution is "cruel and unusual" within the meaning of the Eighth Amendment simply because it involves a risk of pain— whether "substantial," "unnecessary," or "untoward"—that could be reduced by adopting alternative procedures. And for good reason. It strains credulity to suggest that the defining characteristic of burning at the stake, disemboweling, drawing and quartering, beheading, and the like was that they involved risks of pain that could be eliminated by using alternative methods of execution. Quite plainly, what defined these punishments was that they were *designed* to inflict torture as a way of enhancing a death sentence; they were *intended* to produce a penalty worse than death, to accomplish something "more than the mere extinguishment of life." *Kemmler, supra*, at 447. The evil the Eighth Amendment targets is intentional infliction of gratuitous pain, and that is the standard our method-of-execution cases have explicitly or implicitly

invoked.

Thus, the Court did not find it necessary in *Wilkerson* to conduct a comparative analysis of death by firing squad as opposed to hanging or some other method of execution. Nor did the Court inquire into the precise procedures used to execute an individual by firing squad in order to determine whether they involved risks of pain that could be alleviated by adopting different procedures. It was enough that death by firing squad was well established in military practice, 99 U. S., at 134–135, and plainly did not fall within the "same line of unnecessary cruelty" as the punishments described by Blackstone, *id*., at 136.

The same was true in *Kemmler*. One searches the opinion in vain for a comparative analysis of electrocution versus other methods of execution. The Court observed that the New York Legislature had adopted electrocution in order to replace hanging with "'the most humane and practical method known to modern science of carrying into effect the sentence of death in capital cases.'" 136 U. S., at 444. But there is no suggestion that the Court thought it necessary to sift through the "voluminous mass of evidence . . . taken [in the courts below] as to the effect of electricity as an agent of death," *id*., at 442, in order to confirm that electrocution in fact involved less substantial risks of pain or lingering death than hanging. The court below had rejected the challenge because the "act was passed in the effort to devise a more humane method of reaching the result," and "courts were bound to presume that the legislature was possessed of the facts upon which it took action." *Id*., at 447. Treating the lower court's decision "as involving an adjudication that the statute was not repugnant to the Federal Constitution," *ibid.*, the Court found that conclusion "so plainly right," *ibid*., that it had "no hesitation" in denying the writ of error, *id*., at 449.

Likewise in *Resweber*, the Court was confronted in dramatic fashion with the reality that the electric chair

involved risks of error or malfunction that could result in excruciating pain. See 329 U. S., at 480, n. 2 (Burton, J., dissenting) (quoting affidavits from the petitioner's brief recounting that during the unsuccessful first attempt at electrocution, the petitioner's "'lips puffed out and his body squirmed and tensed and he jumped so that the chair rocked on the floor'"). But absent "malevolence" or a "purpose to inflict unnecessary pain," the Court concluded that the Constitution did not prohibit Louisiana from subjecting the petitioner to those very risks a second time in order to carry out his death sentence. *Id.*, at 463, 464 (plurality opinion); *id.*, at 471 (Frankfurter, J., concurring); see also *Furman* v. *Georgia*, 408 U. S. 238, 326–327 (1972) (Marshall, J., concurring) (describing *Resweber* as holding "that the legislature adopted electrocution for a humane purpose, and that its will should not be thwarted because, in its desire to reduce pain and suffering in most cases, it may have inadvertently increased suffering in one particular case"). No one suggested that Louisiana was required to implement additional safeguards or alternative procedures in order to reduce the risk of a second malfunction. And it was the *dissenters* in *Resweber* who insisted that the absence of an intent to inflict pain was irrelevant. 329 U. S., at 477 (Burton, J., dissenting) ("The intent of the executioner cannot lessen the torture or excuse the result").

IV

Aside from lacking support in history or precedent, the various risk-based standards proposed in this case suffer from other flaws, not the least of which is that they cast substantial doubt on every method of execution other than lethal injection. It may well be that other methods of execution such as hanging, the firing squad, electrocution, and lethal gas involve risks of pain that could be eliminated by switching to lethal injection. Indeed, they have

been attacked as unconstitutional for that very reason. See, *e.g.*, *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 654, 656–657 (1992) (STEVENS, J., dissenting) (arguing that lethal gas violates the Eighth Amendment because of "the availability of more humane and less violent methods of execution," namely, lethal injection); *Glass* v. *Louisiana*, 471 U. S. 1080, 1093 (1985) (Brennan, J., dissenting from denial of certiorari) (arguing that electrocution violates the Eighth Amendment because it poses risks of pain that could be alleviated by "other currently available means of execution," such as lethal injection); *Campbell* v. *Wood*, 18 F. 3d 662, 715 (CA9 1994) (Reinhardt, J., concurring and dissenting) (arguing that hanging violates the Eighth Amendment because it involves risks of pain and mutilation not presented by lethal injection). But the notion that the Eighth Amendment permits only one mode of execution, or that it requires an anesthetized death, cannot be squared with the history of the Constitution.

It is not a little ironic—and telling—that lethal injection, hailed just a few years ago as *the* humane alternative in light of which every other method of execution was deemed an unconstitutional relic of the past, is the subject of today's challenge. It appears the Constitution is "evolving" even faster than I suspected. And it is obvious that, for some who oppose capital punishment on policy grounds, the only acceptable end point of the evolution is for this Court, in an exercise of raw judicial power unsupported by the text or history of the Constitution, or even by a contemporary moral consensus, to strike down the death penalty as cruel and unusual in all circumstances. In the meantime, though, the next best option for those seeking to abolish the death penalty is to embroil the States in never-ending litigation concerning the adequacy of their execution procedures. But far from putting an end to abusive litigation in this area, and thereby vindicating

in some small measure the States' "significant interest in meting out a sentence of death in a timely fashion," *Nelson* v. *Campbell*, 541 U. S. 637, 644 (2004), today's decision is sure to engender more litigation. At what point does a risk become "substantial"? Which alternative procedures are "feasible" and "readily implemented"? When is a reduction in risk "significant"? What penological justifications are "legitimate"? Such are the questions the lower courts will have to grapple with in the wake of today's decision. Needless to say, we have left the States with nothing resembling a bright-line rule.

Which brings me to yet a further problem with comparative-risk standards: They require courts to resolve medical and scientific controversies that are largely beyond judicial ken. Little need be said here, other than to refer to the various opinions filed by my colleagues today. Under the competing risk standards advanced by the plurality opinion and the dissent, for example, the difference between a lethal injection procedure that satisfies the Eighth Amendment and one that does not may well come down to one's judgment with respect to something as hairsplitting as whether an eyelash stroke is necessary to ensure that the inmate is unconscious, or whether instead other measures have already provided sufficient assurance of unconsciousness. Compare *post*, at 6 (GINSBURG, J., dissenting) (criticizing Kentucky's protocol because "[n]o one calls the inmate's name, shakes him, brushes his eyelashes to test for a reflex, or applies a noxious stimulus to gauge his response"), with *ante*, at 22 (rejecting the dissent's criticisms because "an inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the State could take as a failsafe for other, independently adequate measures"). We have neither the authority nor the expertise to micromanage the States' administration of the death penalty in this manner. There is simply no reason to believe that "unelected" judges without scien-

tific, medical, or penological training are any better suited
to resolve the delicate issues surrounding the administra-
tion of the death penalty than are state administrative
personnel specifically charged with the task.  Cf. *ante*, at 5
(STEVENS, J., concurring in judgment) (criticizing the
States' use of the three-drug protocol because "[i]n the
majority of States that use the three-drug protocol, the
drugs were selected by unelected Department of Correc-
tion officials with no specialized medical knowledge and
without the benefit of expert assistance or guidance").

In short, I reject as both unprecedented and unworkable
any standard that would require the courts to weigh the
relative advantages and disadvantages of different meth-
ods of execution or of different procedures for implement-
ing a given method of execution.  To the extent that there
is any comparative element to the inquiry, it should be
limited to whether the challenged method inherently
inflicts significantly more pain than traditional modes of
execution such as hanging and the firing squad.  See, *e.g.*,
*Gray* v. *Lucas*, 463 U. S. 1237, 1239–1240 (1983) (Burger,
C. J., concurring in denial of certiorari) (rejecting an
Eighth Amendment challenge to lethal gas because the
petitioner had not shown that "'the pain and terror result-
ing from death by cyanide gas is so different in degree or
nature from that resulting from other traditional modes of
execution as to implicate the eighth amendment right'"
(quoting *Gray* v. *Lucas*, 710 F. 2d 1048, 1061 (CA5 1983)));
*Hernandez* v. *State*, 43 Ariz. 424, 441, 32 P. 2d 18, 25
(1934) ("The fact that [lethal gas] is less painful and more
humane than hanging is all that is required to refute
completely the charge that it constitutes cruel and un-
usual punishment within the meaning of this expression
as used in [the Eighth Amendment]").

## V

Judged under the proper standard, this is an easy case.

It is undisputed that Kentucky adopted its lethal injection protocol in an effort to make capital punishment more humane, not to add elements of terror, pain, or disgrace to the death penalty.  And it is undisputed that, if administered properly, Kentucky's lethal injection protocol will result in a swift and painless death.  As the Sixth Circuit observed in rejecting a similar challenge to Tennessee's lethal injection protocol, we "do not have a situation where the State has any intent (or anything approaching intent) to inflict unnecessary pain; the complaint is that the State's *pain-avoidance procedure* may fail because the executioners may make a mistake in implementing it." *Workman* v. *Bredesen*, 486 F. 3d 896, 907 (2007).  But "[t]he risk of negligence in implementing a death-penalty procedure . . . does not establish a cognizable Eighth Amendment claim."  *Id.*, at 907–908.  Because Kentucky's lethal injection protocol is designed to eliminate pain rather than to inflict it, petitioners' challenge must fail.  I accordingly concur in the Court's judgment affirming the decision below.

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–5439

———————

RALPH BAZE AND THOMAS C. BOWLING, PETI-
TIONERS *v.* JOHN D. REES, COMMISSIONER,
KENTUCKY DEPARTMENT OF
CORRECTIONS, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF KENTUCKY

[April 16, 2008]

JUSTICE BREYER, concurring in the judgment.

Assuming the lawfulness of the death penalty itself, petitioners argue that Kentucky's method of execution, lethal injection, nonetheless constitutes a constitutionally forbidden, "cruel and usual punishmen[t]." U. S. Const., Amdt. 8. In respect to *how* a court should review such a claim, I agree with JUSTICE GINSBURG. She highlights the relevant question, whether the method creates an untoward, readily avoidable risk of inflicting severe and unnecessary suffering. *Post*, at 11 (dissenting opinion). I agree that the relevant factors—the "degree of risk," the "magnitude of pain," and the "availability of alternatives"—are interrelated and each must be considered. *Post*, at 4. At the same time, I believe that the legal merits of the kind of claim presented must inevitably turn not so much upon the wording of an intermediate standard of review as upon facts and evidence. And I cannot find, either in the record in this case or in the literature on the subject, sufficient evidence that Kentucky's execution method poses the "significant and unnecessary risk of inflicting severe pain" that petitioners assert. Brief for Petitioners 28.

In respect to the literature, I have examined the periodi-

cal article that seems first to have brought widespread legal attention to the claim that lethal injection might bring about unnecessary suffering. See *ante*, at 13, n. 2 (plurality opinion); Denno, The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty, 76 Ford. L. Rev. 49, 105, n. 366 (2007) (collecting cases in which condemned inmates cited the Lancet study). The article, by Dr. Leonidas G. Koniaris, Teresa A. Zimmers (of the University of Miami School of Medicine), and others, appeared in the April 16, 2005, issue of the Lancet*,* an eminent, peer-reviewed medical journal. See Koniaris, Zimmers, Lubarsky, & Sheldon, Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412 (hereinafter Lancet Study). The authors examined "autopsy toxicology results from 49 executions in Arizona, Georgia, North Carolina, and South Carolina." *Id.*, at 1412–1413. The study noted that lethal injection usually consists of sequential administration of a barbiturate (sodium thiopental), followed by injection of a paralyzing agent (pancuronium bromide) and a heart-attack-inducing drug (potassium chloride). The study focused on the effectiveness of the first drug in anaesthetizing the inmate. See *id.*, at 1412. It noted that the four States used 2 grams of thiopental. *Id.*, at 1413. (Kentucky follows a similar system but currently uses 3 grams of sodium thiopental. See *ante*, at 5–6 (plurality opinion)). Although the sodium thiopental dose (of, say, 2 grams) was several times the dose used in ordinary surgical operations, the authors found that the level of barbiturate present in the bloodstream several hours (or more) after death was *lower* than the level one might expect to find during an operation. Lancet Study 1413–1414. With certain qualifications, they state that "21 (43%)" of the examined instances "had [thiopental] concentrations consistent with consciousness," *id.*, at 1413,—a fact that should create considerable concern given the related likelihood of unexpressed suffering.

The authors suggest that, among other things, inadequate training may help explain the results. *Id.*, at 1414.

The Lancet Study, however, may be seriously flawed. In its September 24, 2005, issue, the Lancet published three responses. The first, by one of the initial referees, Jonathan I. Groner of Children's Hospital, Columbus, Ohio, claimed that a low level of thiopental in the bloodstream does not necessarily mean that an inadequate dose was given, for, under circumstances likely common to lethal injections, thiopental can simply diffuse from the bloodstream into surrounding tissues. See Inadequate Anaesthesia in Lethal Injection for Execution, 366 Lancet 1073. And a long pause between death and measurement means that this kind of diffusion likely occurred. See *ibid.* For this reason and others, Groner, who said he had initially "expressed strong support for the article," had become "concerned" that its key finding "may be erroneous because of lack of equipoise in the study." *Ibid.*

The second correspondents, Mark J. S. Heath (petitioners' expert in their trial below), Donald R. Stanski, and Derrick J. Pounder, respectively of the Department of Anesthesiology, Columbia University, of Stanford University School of Medicine, and the University of Dundee, United Kingdom, concluded that "Koniaris and colleagues do not present scientifically convincing data to justify their conclusion that so large a proportion of inmates have experienced awareness during lethal injection." *Ibid.* These researchers noted that because the blood samples were taken "several hours to days after" the inmates' deaths, the postmortem concentrations of thiopental—a lipophilic drug that diffuses from blood into tissue—could not be relied on as accurate indicators for concentrations in the blood stream during life. *Ibid.* See also *ante*, at 12–13, n. 2 (plurality opinion).

The third correspondents, Robyn S. Weisman, Jeffrey N. Bernstein, and Richard S. Weisman, of the University of

Miami, School of Medicine, and Florida Poison Information Center, said that "[p]ost-mortem drug concentrations are extremely difficult to interpret and there is substantial variability in results depending on timing, anatomical origin of the specimen, and physical and chemical properties of the drug." 366 Lancet, at 1074. They believed that the original finding "requires further assessment." *Ibid.*

The authors of the original study replied, defending the accuracy of their findings. See *id.*, at 1074–1076. Yet, neither the petition for certiorari nor any of the briefs filed in this Court (including seven *amici curiae* briefs supporting the petitioners) make any mention of the Lancet Study, which was published during petitioners' trial. In light of that fact, and the responses to the original study, a judge, nonexpert in these matters, cannot give the Lancet Study significant weight.

The literature also contains a detailed article on the subject, which appeared in 2002 in the Ohio State Law Journal. The author, Professor Deborah W. Denno, examined executions by lethal injection in the 36 States where thiopental is used. See When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us, 63 Ohio St. L. J. 63. In Table 9, the author lists 31 "Botched Lethal Injection Executions" in the time from our decision in *Gregg* v. *Georgia*, 429 U. S. 1301 (1976), through 2001. See Denno, 63 Ohio St. L. J., at 139–141. Of these, 19 involved a problem of locating a suitable vein to administer the chemicals. *Ibid.* Eleven of the remaining 12 apparently involved strong, readily apparent physical reactions. *Ibid.* One, taking place in Illinois in 1990, is described as involving "some indication that, while appearing calm on the outside due to the paralyzing drugs, [the inmate] suffered excruciating pain." *Id.*, at 139. The author adds that "[t]here were reports of faulty equipment and inexperienced personnel." *Ibid.* This

article, about which Professor Denno testified at petition-ers' trial and on which petitioners rely in this Court, may well provide cause for concern about the administration of the lethal injection. But it cannot materially aid the petitioners here. That is because, as far as the record here reveals, and as the Kentucky courts found, Kentucky's use of trained phlebotomists and the presence of observers should prevent the kind of "botched" executions that Denno's Table 9 documents.

The literature also casts a shadow of uncertainty upon the ready availability of some of the alternatives to lethal execution methods. Petitioners argued to the trial court, for example, that Kentucky should eliminate the use of a paralytic agent, such as pancuronium bromide, which could, by preventing any outcry, mask suffering an inmate might be experiencing because of inadequate administra-tion of the anesthetic. See Brief for Petitioners 51–57; Reply Brief for Petitioners 18, and n. 6. And they point out that use of pancuronium bromide to euthanize animals is contrary to veterinary standards. See *id.*, at 20 (citing Brief for Dr. Kevin Concannon et al. as *Amici Curiae* 17–18). See also the Concannon Brief 4, 18, n. 5 (noting that Kentucky, like 22 other States, prohibits the use of neu-romuscular blocking agents in euthanizing animals). In the Netherlands, however, the use of pancuronium bro-mide is recommended for purposes of lawful assisted suicide. See *ante*, at 19–20 (plurality opinion) (discussing the Royal Dutch Society for the Advancement of Pharmacy recommendation of the use of a muscle relaxant such as pancuronium in addition to thiopental). See also Kimsma, Euthanasia and Euthanizing Drugs in The Netherlands, reprinted in Drug Use in Assisted Suicide and Euthanasia 193, 199–202 (M. Battin & A. Lipman eds. 1996) (discuss-ing use of neuromuscular relaxants). Why, one might ask, if the use of pancuronium bromide is undesirable, would those in the Netherlands, interested in practices designed

to bring about a humane death, recommend the use of
that, or similar, drugs?  Petitioners pointed out that in the
Netherlands, physicians trained in anesthesiology are
involved in assisted suicide, while that is not the case in
Kentucky.  See Tr. of Oral Arg. 55.  While important, that
difference does not resolve the apparently conflicting
views about the inherent propriety or impropriety of use of
this drug to extinguish human life humanely.

Similarly, petitioners argue for better trained personnel.
But it is clear that both the American Medical Association
(AMA) and the American Nursing Association (ANA) have
rules of ethics that strongly oppose their members' par-
ticipation in executions.  See Brief for American Society
of Anesthesiologists as *Amicus Curiae* 2–3 (citing
AMA, Code of Medical Ethics, Policy E–2.06 Capital
Punishment (2000), online at http://www.ama-assn.org/
ama1/pub/upload/mm/369/e206capitalpunish.pdf (all In-
ternet materials as visited Apr. 10, 2008, and available
in Clerk of Court's case file)); ANA, Position State-
ment: Nurses' Participation in Capital Punishment
(1994), http://nursingworld.org/MainMenuCategories/
HealthcareandPolicyIssues/ANAPositionStatements/
EthicsandHumanRights.aspx (noting that nurses' par-
ticipation in executions "is viewed as contrary to the fun-
damental goals and ethical traditions of the profession").
Cf. Ky. Rev. Stat. Ann. §431.220(3) (West 2006) (Kentucky
prohibiting a physician from participating in the "conduct
of an execution," except to certify the cause of death).  And
these facts suggest that finding better trained personnel
may be more difficult than might, at first blush, appear.

Nor can I find in the record in this case any stronger
evidence in petitioners' favor than the literature itself
provides of an untoward, readily avoidable risk of severe
pain.  Indeed, JUSTICE GINSBURG has accepted what I
believe is petitioners' strongest claim, namely, Kentucky

should require more thorough testing as to unconsciousness. See *post*, at 5–11. In respect to this matter, however, I must agree with the plurality and JUSTICE STEVENS. The record provides too little reason to believe that such measures, if adopted in Kentucky, would make a significant difference.

The upshot is that I cannot find, either in the record or in the readily available literature that I have seen, sufficient grounds to believe that Kentucky's method of lethal injection creates a significant risk of unnecessary suffering. The death penalty itself, of course, brings with it serious risks, for example, risks of executing the wrong person, see, *e.g.*, *ante*, at 16–17 (STEVENS, J., concurring in judgment), risks that unwarranted animus (in respect, *e.g.*, to the race of victims), may play a role, see, *e.g.*, *ante*, at 16, risks that those convicted will find themselves on death row for many years, perhaps decades, to come, see *Smith* v. *Arizona*, 552 U. S. \_\_\_ (2007) (BREYER, J., dissenting from denial of certiorari). These risks in part explain why that penalty is so controversial. But the lawfulness of the death penalty is not before us. And petitioners' proof and evidence, while giving rise to legitimate concern, do not show that Kentucky's method of applying the death penalty amounts to "cruel and unusual punishmen[t]."

For these reasons, I concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–5439

_____

## RALPH BAZE AND THOMAS C. BOWLING, PETI-TIONERS *v.* JOHN D. REES, COMMISSIONER, KENTUCKY DEPARTMENT OF CORRECTIONS, ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KENTUCKY

[April 16, 2008]

JUSTICE GINSBURG, with whom JUSTICE SOUTER joins, dissenting.

It is undisputed that the second and third drugs used in Kentucky's three-drug lethal injection protocol, pancuronium bromide and potassium chloride, would cause a conscious inmate to suffer excruciating pain. Pancuronium bromide paralyzes the lung muscles and results in slow asphyxiation. App. 435, 437, 625. Potassium chloride causes burning and intense pain as it circulates throughout the body. *Id.,* at 348, 427, 444, 600, 626. Use of pancuronium bromide and potassium chloride on a conscious inmate, the plurality recognizes, would be "constitutionally unacceptable." *Ante*, at 14.

The constitutionality of Kentucky's protocol therefore turns on whether inmates are adequately anesthetized by the first drug in the protocol, sodium thiopental. Kentucky's system is constitutional, the plurality states, because "petitioners have not shown that the risk of an inadequate dose of the first drug is substantial." *Ante*, at 15. I would not dispose of the case so swiftly given the character of the risk at stake. Kentucky's protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and

third drugs.  I would vacate and remand with instructions to consider whether Kentucky's omission of those safeguards poses an untoward, readily avoidable risk of inflicting severe and unnecessary pain.

## I

The Court has considered the constitutionality of a specific method of execution on only three prior occasions. Those cases, and other decisions cited by the parties and *amici*, provide little guidance on the standard that should govern petitioners' challenge to Kentucky's lethal injection protocol.

In *Wilkerson* v. *Utah*, 99 U. S. 130 (1879), the Court held that death by firing squad did not rank among the "cruel and unusual punishments" banned by the Eighth Amendment.  In so ruling, the Court did not endeavor "to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted."  *Id.,* at 135–136.  But it was "safe to affirm," the Court stated, that "punishments of torture . . . , and all others in the same line of unnecessary cruelty, are forbidden."  *Id.,* at 136.

Next, in *In re Kemmler*, 136 U. S. 436 (1890), death by electrocution was the assailed method of execution.[1]  The Court reiterated that the Eighth Amendment prohibits "torture" and "lingering death."  *Id.,* at 447.  The word "cruel," the Court further observed, "implies . . . something inhuman . . . something more than the mere extinguishment of life."  *Ibid.*  Those statements, however, were made *en passant*.  *Kemmler*'s actual holding was that the Eighth Amendment does not apply to the States, *id.,* at

_____

[1] Hanging was the State's prior mode of execution.  Electrocution, considered "less barbarous," indeed "the most humane" way to administer the death penalty, was believed at the time to "result in instantaneous, and consequently in painless, death."  *In re Kemmler*, 136 U. S. 436, 443–444 (1890) (internal quotation marks omitted).

448–449,[2] a proposition we have since repudiated, see, *e.g., Robinson* v. *California*, 370 U. S. 660 (1962).

Finally, in *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459 (1947), the Court rejected Eighth and Fourteenth Amendment challenges to a reelectrocution following an earlier attempt that failed to cause death. The plurality opinion in that case first stated: "The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence." *Id.,* at 463. But the very next sentence varied the formulation; it referred to the "[p]rohibition against the wanton infliction of pain." *Ibid.*

No clear standard for determining the constitutionality of a method of execution emerges from these decisions. Moreover, the age of the opinions limits their utility as an aid to resolution of the present controversy. The Eighth Amendment, we have held, "'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Atkins* v. *Virginia*, 536 U. S. 304, 311–312 (2002) (quoting *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion)). *Wilkerson* was decided 129 years ago, *Kemmler* 118 years ago, and *Resweber* 61 years ago. Whatever little light our prior method-of-execution cases might shed is thus dimmed by the passage of time.

Further phrases and tests can be drawn from more recent decisions, for example, *Gregg* v. *Georgia*, 428 U. S. 153 (1976). Speaking of capital punishment in the abstract, the lead opinion said that the Eighth Amendment prohibits "the unnecessary and wanton infliction of pain," *id.,* at 173 (joint opinion of Stewart, Powell, and STEVENS, JJ.); the same opinion also cautioned that a death sen-

─────────

[2] The Court also ruled in *Kemmler* that the State's election to carry out the death penalty by electrocution in lieu of hanging encountered no Fourteenth Amendment shoal: No privilege or immunity of United States citizenship was entailed, nor did the Court discern any deprivation of due process. *Id.,* at 448–449.

tence cannot "be imposed under sentencing procedures that creat[e] a substantial risk that it would be inflicted in an arbitrary and capricious manner," *id.,* at 188.

Relying on *Gregg* and our earlier decisions, the Kentucky Supreme Court stated that an execution procedure violates the Eighth Amendment if it "creates a substantial risk of wanton and unnecessary infliction of pain, torture or lingering death." 217 S. W. 3d 207, 209, 210 (2006). Petitioners respond that courts should consider "(a) the severity of pain risked, (b) the likelihood of that pain occurring, *and* (c) the extent to which alternative means are feasible." Brief for Petitioners 38 (emphasis added). The plurality settles somewhere in between, requiring a "substantial risk of serious harm" and considering whether a "feasible, readily implemented" alternative can "significantly reduce" that risk. *Ante*, at 13 (internal quotation marks omitted).

I agree with petitioners and the plurality that the degree of risk, magnitude of pain, and availability of alternatives must be considered. I part ways with the plurality, however, to the extent its "substantial risk" test sets a fixed threshold for the first factor. The three factors are interrelated; a strong showing on one reduces the importance of the others.

Lethal injection as a mode of execution can be expected, in most instances, to result in painless death. Rare though errors may be, the consequences of a mistake about the condemned inmate's consciousness are horrendous and effectively undetectable after injection of the second drug. Given the opposing tugs of the degree of risk and magnitude of pain, the critical question here, as I see it, is whether a feasible alternative exists. Proof of "a slightly or marginally safer alternative" is, as the plurality notes, insufficient. *Ante,* at 12. But if readily available measures can materially increase the likelihood that the protocol will cause no pain, a State fails to adhere to con-

temporary standards of decency if it declines to employ those measures.

## II

Kentucky's Legislature adopted lethal injection as a method of execution in 1998. See 1998 Ky. Acts ch. 220, p. 777, Ky. Rev. Stat. Ann. §431.220(1)(a) (West 2006). Lawmakers left the development of the lethal injection protocol to officials in the Department of Corrections. Those officials, the trial court found, were "given the task without the benefit of scientific aid or policy oversight." App. 768. "Kentucky's protocol," that court observed, "was copied from other states and accepted without challenge." *Ibid.* Kentucky "did not conduct any independent scientific or medical studies or consult any medical professionals concerning the drugs and dosage amounts to be injected into the condemned." *Id.,* at 760. Instead, the trial court noted, Kentucky followed the path taken in other States that "simply fell in line" behind the three-drug protocol first developed by Oklahoma in 1977. *Id.,* at 756. See also *ante*, at 4, n. 1 (plurality opinion).

Kentucky's protocol begins with a careful measure: Only medical professionals may perform the venipunctures and establish intravenous (IV) access. Members of the IV team must have at least one year's experience as a certified medical assistant, phlebotomist, emergency medical technician (EMT), paramedic, or military corpsman. App. 984; *ante*, at 16 (plurality opinion). Kentucky's IV team currently has two members: a phlebotomist with 8 years' experience and an EMT with 20 years' experience. App. 273–274. Both members practice siting catheters at ten lethal injection training sessions held annually. *Id.,* at 984.

Other than using qualified and trained personnel to establish IV access, however, Kentucky does little to ensure that the inmate receives an effective dose of sodium

thiopental.  After siting the catheters, the IV team leaves the execution chamber.  *Id.,* at 977.  From that point forward, only the warden and deputy warden remain with the inmate.  *Id.,* at 276.  Neither the warden nor the deputy warden has any medical training.

The warden relies on visual observation to determine whether the inmate "appears" unconscious.  *Id.,* at 978.  In Kentucky's only previous execution by lethal injection, the warden's position allowed him to see the inmate best from the waist down, with only a peripheral view of the inmate's face.  See *id.,* at 213–214.  No other check for consciousness occurs before injection of pancuronium bromide.  Kentucky's protocol does not include an automatic pause in the "rapid flow" of the drugs, *id.,* at 978, or any of the most basic tests to determine whether the sodium thiopental has worked.  No one calls the inmate's name, shakes him, brushes his eyelashes to test for a reflex, or applies a noxious stimulus to gauge his response.

Nor does Kentucky monitor the effectiveness of the sodium thiopental using readily available equipment, even though the inmate is already connected to an electrocardiogram (EKG), *id.,* at 976.  A drop in blood pressure or heart rate after injection of sodium thiopental would not prove that the inmate is unconscious, see *id.,* at 579–580; *ante*, at 20–21 (plurality opinion), but would signal that the drug has entered the inmate's bloodstream, see App. 424, 498, 578, 580; 8 Tr. 1099 (May 2, 2005).  Kentucky's own expert testified that the sodium thiopental should "cause the inmate's blood pressure to become very, very low," App. 578, and that a precipitous drop in blood pressure would "confir[m]" that the drug was having its expected effect, *id.,* at 580.  Use of a blood pressure cuff and EKG, the record shows, is the standard of care in surgery requiring anesthesia.  *Id.,* at 539.[3]

———————

[3] The plurality deems medical standards irrelevant in part because

A consciousness check supplementing the warden's visual observation before injection of the second drug is easily implemented and can reduce a risk of dreadful pain. Pancuronium bromide is a powerful paralytic that prevents all voluntary muscle movement. Once it is injected, further monitoring of the inmate's consciousness becomes impractical without sophisticated equipment and training. Even if the inmate were conscious and in excruciating pain, there would be no visible indication.[4]

Recognizing the importance of a window between the first and second drugs, other States have adopted safeguards not contained in Kentucky's protocol. See Brief for Criminal Justice Legal Foundation as *Amicus Curiae* 19–23.[5] Florida pauses between injection of the first and second drugs so the warden can "determine, after consultation, that the inmate is indeed unconscious." *Lightbourne* v. *McCollum*, 969 So. 2d 326, 346 (Fla. 2007) *(per curiam)* (internal quotation marks omitted). The warden

––––––––––

"drawn from a different context." *Ante*, at 21. Medical professionals monitor blood pressure and heart rate, however, not just to save lives, but also to reduce the risk of consciousness during otherwise painful procedures. Considering that the constitutionality of Kentucky's protocol depends on guarding against the same risk, see *supra*, at 1; *ante*, at 14–15 (plurality opinion), the plurality's reluctance to consider medical practice is puzzling. No one is advocating the wholesale incorporation of medical standards into the Eighth Amendment. But Kentucky could easily monitor the inmate's blood pressure and heart rate without physician involvement. That medical professionals consider such monitoring important enough to make it the standard of care in medical practice, I remain persuaded, is highly instructive.

[4] Petitioners' expert testified that a layperson could not tell from visual observation if a paralyzed inmate was conscious and that doing so would be difficult even for a professional. App. 418. Kentucky's warden candidly admitted: "I honestly don't know what you'd look for." *Id.,* at 283.

[5] Because most death-penalty States keep their protocols secret, a comprehensive survey of other States' practices is not available. See Brief for American Civil Liberties Union et al. as *Amici Curiae* 6–12.

does so by touching the inmate's eyelashes, calling his name, and shaking him. *Id.*, at 347.[6] If the inmate's consciousness remains in doubt in Florida, "the medical team members will come out from the chemical room and consult in the assessment of the inmate." *Ibid.* During the entire execution, the person who inserted the IV line monitors the IV access point and the inmate's face on closed circuit television. *Ibid.*

In Missouri, "medical personnel must examine the prisoner physically to confirm that he is unconscious using standard clinical techniques and must inspect the catheter site again." *Taylor* v. *Crawford*, 487 F. 3d 1072, 1083 (CA8 2007). "The second and third chemicals are injected only after confirmation that the prisoner is unconscious and after a period of at least three minutes has elapsed from the first injection of thiopental." *Ibid.*

In California, a member of the IV team brushes the inmate's eyelashes, speaks to him, and shakes him at the halfway point and, again, at the completion of the sodium thiopental injection. See State of California, San Quentin Operational Procedure No. 0–770, Execution by Lethal Injection, §V(S)(4)(e) (2007), online at http://www.cdcr.ca.gov/News/docs/RevisedProtocol.pdf.

In Alabama, a member of the execution team "begin[s] by saying the condemned inmate's name. If there is no

————————

[6] Florida's expert in *Lightbourne* v. *McCollum*, 969 So. 2d 326 (Fla. 2007) *(per curiam)*, who also served as Kentucky's expert in this case, testified that the eyelash test is "probably the most common first assessment that we use in the operating room to determine . . . when a patient might have crossed the line from being conscious to unconscious." 4 Tr. in *Florida* v. *Lightbourne*, No. 81–170–CF (Fla. Cir. Ct., Marion Cty.), p. 511, online at http://www.cjlf.org/files/ LightbourneRecord.pdf (all Internet materials as visited Apr. 14, 2008, and in Clerk of Court's case file). "A conscious person, if you touch their eyelashes very lightly, will blink; an unconscious person typically will not." *Ibid.* The shaking and name-calling tests, he further testified, are similar to those taught in basic life support courses. See *id.*, at 512.

response, the team member will gently stroke the condemned inmate's eyelashes. If there is no response, the team member will then pinch the condemned inmate's arm." Respondents' Opposition to Callahan's Application for a Stay of Execution in *Callahan* v. *Allen*, O. T. 2007, No. 07A630, p. 3 (internal quotation marks omitted).

In Indiana, officials inspect the injection site after administration of sodium thiopental, say the inmate's name, touch him, and use ammonia tablets to test his response to a noxious nasal stimulus. See Tr. of Preliminary Injunction Hearing in 1:06–cv–1859 (SD Ind.), pp. 199–200, online at http://www.law.berkeley.edu/clinics/dpclinic/ LethalInjection/Public/MoralesTaylorAmicus/20.pdf (hereinafter Timberlake Hearing).[7]

These checks provide a degree of assurance—missing from Kentucky's protocol—that the first drug has been properly administered. They are simple and essentially costless to employ, yet work to lower the risk that the inmate will be subjected to the agony of conscious suffocation caused by pancuronium bromide and the searing pain caused by potassium chloride. The record contains no explanation why Kentucky does not take any of these elementary measures.

The risk that an error administering sodium thiopental would go undetected is minimal, Kentucky urges, because if the drug was mistakenly injected into the inmate's tissue, not a vein, he "would be awake and screaming." Tr. of Oral Arg. 30–31. See also Brief for Respondents 42; Brief for State of Texas et al. as *Amici Curiae* 26–27. That argument ignores aspects of Kentucky's protocol that render passive reliance on obvious signs of consciousness, such as screaming, inadequate to determine whether the inmate is experiencing pain.

---

[7] In Indiana, a physician also examines the inmate after injection of the first drug. Timberlake Hearing 199.

First, Kentucky's use of pancuronium bromide to para-
lyze the inmate means he will not be able to scream after
the second drug is injected, no matter how much pain he is
experiencing. Kentucky's argument, therefore, appears to
rest on the assertion that sodium thiopental is itself pain-
ful when injected into tissue rather than a vein. See App.
601. The trial court made no finding on that point, and
Kentucky cites no supporting evidence from executions in
which it is known that sodium thiopental was injected into
the inmate's soft tissue. See, *e.g., Lightbourne*, 969 So. 2d,
at 344 (describing execution of Angel Diaz).

Second, the inmate may receive enough sodium thiopen-
tal to mask the most obvious signs of consciousness with-
out receiving a dose sufficient to achieve a surgical plane
of anesthesia. See 7 Tr. 976 (Apr. 21, 2005). If the drug is
injected too quickly, the increase in blood pressure can
cause the inmate's veins to burst after a small amount of
sodium thiopental has been administered. Cf. App. 217
(describing risk of "blowout"). Kentucky's protocol does
not specify the rate at which sodium thiopental should be
injected. The executioner, who does not have any medical
training, pushes the drug "by feel" through five feet of
tubing. *Id.,* at 284, 286–287.[8] In practice sessions, unlike
in an actual execution, there is no resistance on the cathe-
ter, see *id.,* at 285; thus the executioner's training may
lead him to push the drugs too fast.

"The easiest and most obvious way to ensure that an
inmate is unconscious during an execution," petitioners
argued to the Kentucky Supreme Court, "is to check for
consciousness prior to injecting pancuronium [bromide]."
Brief for Appellants in No. 2005–SC–00543, p. 41. See

---

[8] The length of the tubing contributes to the risk that the inmate will
receive an inadequate dose of sodium thiopental. The warden and
deputy warden watch for obvious leaks in the execution chamber, see
*ante*, at 6 (plurality opinion), but the line also snakes into the neighbor-
ing control room through a small hole in the wall, App. 280.

also App. 30 (Complaint) (alleging Kentucky's protocol does not "require the execution team to determine that the condemned inmate is unconscious prior to administering the second and third chemicals"). The court did not address petitioners' argument. I would therefore remand with instructions to consider whether the failure to include readily available safeguards to confirm that the inmate is unconscious after injection of sodium thiopental, in combination with the other elements of Kentucky's protocol, creates an untoward, readily avoidable risk of inflicting severe and unnecessary pain.